ELY LILLY & COMPANY v. L. S. SAUNDERS, TRADING AS
SAUNDERS DRUG STORE.

(Filed 27 September, 1939.)

1. **Constitutional Law § 6b—**
    In determining the validity of a statute permitting the establishment of
    minimum retail sale prices on trade-marked goods, the courts are con-
    cerned solely with the legislative power to enact such statute, the question
    of public policy upon the conflicting economic theories being for the
    Legislature to determine.

2. **Constitutional Law § 12: Monopolies § 1—North Carolina Fair Trade**
    **Act held not to create or tend to create monopoly in violation of Art. I,**
    **sec. 31.**
    The North Carolina Fair Trade Act, ch. 350, Public Laws of 1937, per-
    mitting the manufacturer or distributor of trade-marked goods to estab-
    lish the minimum retail sale price of such goods by contract with whole-
    salers and retailers, and providing that sale by retailers not parties to
    the contracts at prices less than those stipulated in the contracts should
    be deemed unfair competition, is not void as creating or tending to create
    monopolies in contravention of Art. I, sec. 31, of the State Constitution,
    since the restrictions imposed by the act are limited and apply solely to
    trade-marked goods in their vertical distribution from manufacturer or
    distributor through the wholesalers and retailers to the consumer, which
    goods are sold by the retailer in competition with goods of the same
    general class of other manufacturers or, in the case of patented goods, in
    competition with comparable products of other manufacturers, and there-
    fore the act does not create or tend to create a monopoly by horizontal
    agreements between persons in the same business in competition with
    each other.

3. **Constitutional Law § 12: Monopolies § 1—Definition of monopoly.**
    Monopoly is ownership or control of so large a part of the market
    supply or output of a given commodity as to stifle competition, restrict
    freedom of commerce and give control of the price; and while restraint of
    trade may be an instrument of monopoly, it does not, in itself, constitute
    monopoly or necessarily lead thereto, nor does the common law definition
    of monopoly import to that term as used in the Constitution prohibition
    against all price fixing agreements, since the common law recognized
    exceptions for the protection of good will, and while public policy con-
    demned conspiracies and agreements to raise prices to the public detri-
    ment, it did not seek to obtain the lowest possible price to the consumer
    on every commodity.

4. **Constitutional Law § 3a—**
    The Constitution must be construed as stating fundamental concepts in
    broad and comprehensive terms, anticipating implementation by statute
    or liberal construction by the courts to meet changing conditions.

5. **Constitutional Law § 18—North Carolina Fair Trade Act held not to**
    **deprive noncontracting retailers of any property right.**
    The North Carolina Fair Trade Act, permitting the establishment of
    minimum retail prices on trade-marked goods by agreement, does not

deprive a retailer not a party to a contract with the manufacturer or distributor of any property right in preventing such retailer from selling the trade-marked article at a price less than that stipulated by contract, since such retailer acquires title with knowledge and subject to the stipulations relative to the minimum retail price permitted by the law in protecting the property right of the manufacturer or distributor in his trade-mark and good will, which property right subsists while the goods bear his trade-mark, even after he has parted with title of the commodity itself. Art. I, sec. 17, of the State Constitution.

**6. Constitutional Law § 4c—North Carolina Fair Trade Act held not unconstitutional as delegation of legislative authority.**

The North Carolina Fair Trade Act is not unconstitutional as a delegation of legislative authority, since the act is complete in itself and requires no action on the part of any agency to put it into operation; nor does it grant authority to others to fix the prices of commodities generally, but merely lifts the ban against price-fixing contracts in the sale of trade-marked commodities and protects the owner or distributor of such trade-marked commodities against nullification of his agreements relating to minimum retail sale price by sale at less than the minimum price on the part of noncontracting retailers, which restrictions are in the interest of the owner or distributor, the contracting retailers, and the public generally, in the legitimate protection of the owner's or distributor's property right in his trade-mark and good will.

**7. Statutes § 2—Statute regulating trade is not special act if its application is based on reasonable classifications and applies equally to all coming therein.**

The Legislature has the power to regulate trade by general statute, the inhibition of Art. II, sec. 29, applying solely to such regulation by private, special, or local law; and a law regulating trade will be held general and not inhibited by this section of the Constitution if its application is limited to classifications based on reasonable distinctions and is not arbitrary or capricious and applies equally to all persons or things coming within the classifications regulated, which classifications may be made either directly or by provision of the act exempting from its operation classifications based upon reasonable distinctions and consonant with the general purpose of the act.

**8. Statutes § 2—**

The North Carolina Fair Trade Act in limiting its application to commodities bearing a trade-mark and in exempting from its operation such commodities when sold to particular classes of persons, sets up reasonable classifications and applies uniformly to all persons or things coming therein, and therefore is a general act regulating trade and does not contravene Art. II, sec. 29, of the State Constitution.

**9. Trade-marks § 4—**

The provision of the North Carolina Fair Trade Act making its violation actionable at the suit of any person damaged thereby authorizes a suit by a manufacturer or distributor protected by the act against a noncontracting retailer to permanently enjoin such retailer from selling trade-marked commodities of the manufacturer or distributor in violation of the act upon allegations of accrued and prospective irreparable damages.

**10. Same—**

The fact that a manufacturer or distributor of trade-marked commodities permits the sale of such commodities to a non-contracting retailer does not preclude the manufacturer or distributor from maintaining a suit against such retailer under the North Carolina Fair Trade Act, since the manufacturer or distributor has the option to obtain a contract or rely upon the statute, and since the sale to the noncontracting retailer does not confer upon him the right to violate the statute with reference to which he is deemed to have contracted in making the purchase.

**11. Same—**

The fact that a retailer makes a reasonable profit upon trade-marked articles is no defense in a suit against such retailer for selling such articles at a price below that allowed by the North Carolina Fair Trade Act, since the standard of the statute is one of retail price and not of reasonable profit.

**12. Same—**

The fact that the prices of the restricted number of manufacturers manufacturing a product pursuant to patent licensing agreements are practically the same is no defense in an action by one of such manufacturers against a retailer for selling the product manufactured by him in violation of the North Carolina Fair Trade Act, since the substantial identity of price as fixed by the several competing distributors is not unlawful in the absence of an agreement between them to so fix the price.

BARNHILL, J., dissenting.

APPEAL by plaintiff from *Stevens, Jr., J.,* at March Term, 1939, of NEW HANOVER. Reversed.

The plaintiff, a manufacturer of pharmaceutical and biological commodities, which it sells and distributes under its own identifying brands, brought this action under chapter 350, Public Laws of 1937, known as the "North Carolina Fair Trade Act," to restrain the defendant, a retail druggist, from reselling these products at cut rate prices, in violation of the statute. The case was heard before Stevens, Jr., J., at March Term, 1939, New Hanover Superior Court, upon an agreed statement of facts, without the intervention of a jury.

The act under consideration aims at the maintenance of resale prices and purports to protect manufacturers, producers, and the general public against "injurious and uneconomic practices in the distribution of competitive commodities bearing a distinguishing trade-mark, brand or name." For convenient reference and understanding of its effect pertinent parts of the statute are reproduced here:

"Sec. 2. No contract relating to the sale or resale of a commodity which bears, or the label or container of which bears, the trade-mark, brand, or name of the producer or distributor of such commodity and which commodity is in free and open competition with commodities of

the same general class produced or distributed by others, shall be deemed in violation of any law of the State of North Carolina by reason of any of the following provisions which may be contained in such contract: (a) That the buyer will not resell such commodity at less than the minimum price stipulated by the seller. (b) That the buyer will require of any dealer to whom he may resell such commodity an agreement that he will not, in turn, resell at less than the minimum price stipulated by the seller. (c) That the seller will not sell such commodity: (1) To any wholesaler, unless such wholesaler will agree not to resell the same to any retailer unless the retailer will in turn agree not to resell the same except to consumers for use and at not less than the stipulated minimum price, and such wholesaler will likewise agree not to resell the same to any other wholesaler unless such other wholesaler will make the same agreement with any wholesaler or retailer to whom he may resell; or (2) to any retailer, unless the retailer will agree not to resell the same except to consumers for use and at not less than the stipulated minimum price."

"Sec. 6. Willfully and knowingly advertising, offering for sale or selling any commodity at less than the price stipulated in any contract entered into pursuant to the provisions of this act, whether the person so advertising, offering for sale or selling is or is not a party to such contract, is unfair competition and is actionable at the suit of any person damaged thereby."

The defendant insists that this statute is contrary to common law and public policy, as an attempted restraint of trade, and that it is void for unconstitutionality, as contravening Article I, sections 1, 7, 17, and 31, and Article II, section 29, of the State Constitution.

It appears from the stipulations that the plaintiff had entered into a substantial number of contracts of the nature designated in the act with various dealers in the State of North Carolina, under which its products were sold and distributed. The defendant was not a party to any of these contracts, but knew of their existence and purport and the resale prices fixed therein, and, claiming to do so as a matter of right, dealt in and resold products of the plaintiff, bearing its distinguishing brands, at prices lower than those so fixed. These commodities were not acquired under any of the exceptive provisions of the act set out in section five.

The products put upon the market by plaintiff and sold at retail by defendant, under the conditions above named, are divided, for the purpose of convenient consideration, into three classes:

CLASS I. Products falling within this class are those which are not protected by any patent but which are marketed by the plaintiff in common with many other manufacturers of pharmaceutical and biologi-

cal products.  In this classification the products produced by plaintiff are sold in North Carolina and throughout the United States in free and open competition with identical or substantially identical commodities produced and distributed by others, and each manufacturer is free to establish and does in fact establish its own selling prices for such commodities.

For example, "Hepicoleum" is a trade-mark which identifies a concentrate of vitamins "A" and "D" manufactured and sold by the plaintiff.  There are eight or more preparations of this character manufactured and sold by various other manufacturers and commonly known to the medical and pharmaceutical professions.  They are used where deficiencies of vitamins A and D are indicated, and a large number of other producers are engaged in marketing concentrates of vitamins A and D independently of the plaintiff.

CLASS II.  Products falling within this class are those which are marketed exclusively by the plaintiff under patents owned or controlled by the plaintiff or under which plaintiff has been granted an exclusive license.  Products in this class are not in competition with identical products produced by other manufacturers.  They are, however, sold in North Carolina and throughout the United States in free and open competition with comparable products produced by other manufacturers, and each of said manufacturers is free to establish and does in fact establish its own selling prices for such products.

As an example, from the agreed facts, "Amytal" is a trade-mark which identifies iso-amyl ethyl barbituric acid manufactured and sold by the plaintiff exclusively under a patent owned by it.  It is one of fifteen or twenty commercially available compounds derived from barbituric acid known to the trade as barbituric acid derivatives.  They are sedatives and hypnotics and are sold by all the producers for the same therapeutical purposes.

CLASS III.  Products falling within this class are those which are marketed by a restricted number of manufacturers pursuant to the terms of patent licensing agreements.  The products of any given manufacturer which fall in this class are sold in North Carolina and throughout the United States in competition with the identical product or products sold by other licensed manufacturers.  In some instances, products in this classification are also in competition with unpatented products which are represented, advertised, and sold for the same conditions, indications, and purposes as the patented products are advertised, represented, and sold.

Other stipulations relate to the damage to plaintiff's business either accrued or likely to accrue because of the alleged unlawful practices of defendant and their threatened continuance.

The trial judge did not give consideration to the application of the statute to the several classes of commodities thus described, but declared the law to be unconstitutional and void, and declined to enjoin the defendant from the cut rate practices declared therein to be unlawful. From this, the plaintiff appealed.

Carr, James & LeGrand, Walton M. Wheeler, Jr., J. C. B. Ehringhaus, and Charles Aycock Poe for plaintiff, appellant.
Kellum & Humphrey for defendant, appellee.

SEAWELL, J. The endeavor to secure favorable recognition by the courts of agreements looking to the maintenance of resale prices, unaided by positive legislative enactment, may be said to have culminated in Dr. Miles Medical Co. v. John D. Park Sons & Co., 220 U. S., 373, 55 L. Ed., 502, in so far, at least, as Federal action was concerned. In that case such contracts were held to be invalid at common law and under the Sherman Anti-Trust Act.

The opinion in that case has been criticized for its want of reality in approach—in not making a sufficient analysis of economic conditions involved in the factual situation presented, in which it was thought there might be found some basis for exception to the legal categories applied. Harvard Law Review, Vol. 49, p. 811; Kale's "Contracts and Combinations in Restraint of Trade," ch. 4; "The Maintenance of Uniform Resale Prices," 64 U. of Pa. L. R., 22. In this connection see dissenting opinion of Justice Holmes.

If the transfer included no more than a mere commodity, involving nothing in which the seller had any further property or interest, the doctrinal aspects of voluntary sale might be satisfied in the expression of the court: "The complainant having sold its product at prices satisfactory to itself, the public is entitled to whatever advantage may be derived from competition in the subsequent traffic." But the fact is that the producer, along with the commodities sold, must, perforce, permit the use of the good will of his business and his brand, and also their abuse, if the law can go with him no further. He is under the compulsion to sell under inadequate protection or withdraw from the market altogether. This good will is as much property as is coal or pig-iron or wheat, subject to audit, appraisal, taxation, purchase and sale, and is the most valuable asset of many businesses. But, unlike the tangibles mentioned, it is vulnerable to assault through the brand which symbolizes it, since it is built up principally through reputation and may be destroyed by its loss.

But the Dr. Miles Medical Co. case, supra, dealt only with contract and did not discourage legislative action in reaching the desired result.

Such statutes have been enacted in most of the states, at least forty-three in number. As these came up for review there followed, of necessity, a re-orientation of the subject in the courts; consideration was shifted from the validity and effectiveness of contract to the power of the states to enact laws having a like purpose and effect. These laws are similar in expression and practically identical in principle and have been sustained uniformly by the courts of last resort in the respective states of enactment, where tested. The single exception our research discloses, is found in *Bristol-Myers Co. v. Webb's Cut Rate Drug Co.,* 188 So., 91 (Fla.). There the act was stricken down because it did not conform to section 16, Article III, of the Florida Constitution, in that the text of the law was not disclosed in the title. Those which have reached the Supreme Court of the United States have been upheld. *Max Factor & Co. v. Kunsman,* 5 Cal. (2d), 446, 55 P. (2d), 177, 299 U. S., 198, 81 L. Ed., 122; *Pyroil Sales Co. v. The Pep Boys, etc.,* 5 Cal. (2d), 784, 55 P. (2d), 194, 299 U. S., 198, 81 L. Ed., 122; *Seagram Distillers Corp. v. Old Dearborn Distributing Co.,* 363 Ill., 610, 2 N. E. (2d), 940, 299 U. S., 183, 81 L. Ed., 109, 106 A. L. R., 1476 (see annotations); *Houbigant Sales Corp. v. Ward's Cut Rate Drug Store,* 123 N. J. E., 40, 196 Atl., 683; *Bourjois Sales Corp. v. Dorfman,* 273 N. Y., 167, 7 N. E. (2d), 30, 110 A. L. R., 1411; *Weco Products Co. v. Reed Drug Co.,* 255 Wis., 474, 274 N. W., 426, are typical and leading cases. These by no means exhaust the list.

The Illinois Fair Trade Act, identical in many respects with the North Carolina Law, and similar in principle throughout, was upheld in *Old Dearborn Distributing Co. v. Seagram Distillers Corp.,* 292 U. S., 183, 81 L. Ed., 109, 106 A. L. R., 1476, and the opinion of the Court, *per Justice Sutherland,* distinguishes the *Dr. Miles Medical Co. case, supra,* and pictures it as forecasting judicial approval when the Court should have before it appropriate legislation.

Courts were quick to realize that the enactment of Fair Trade Acts rendered obsolete the reasoning of many of the prior decisions. Formerly, in the absence of legislative determination, most courts had pronounced such trade agreements contrary to public policy. But, under the Fair Trade Acts, the public policy of such agreements received express approval from the legislatures. No longer were the courts compelled to face the difficult task of determining public policy. The task of the courts became the relatively simple one of deciding whether legislatures have power to validate resale price maintenance contracts.

But in some important respects the final protection accorded to trade-marked goods marks a more fundamental change in attitude than might be involved in a mere acceptance of a statutory declaration of public policy—a break with accepted theory in which many of the stricter

doctrines now urged upon us have been modified or abandoned. It is simply one of those situations in the law which, with some emphasis, marks today from yesterday. Not that the change in the attitude of the courts has been arbitrary—on the contrary, the intervening period has been one of rational adjustment, in which we are compelled to recognize a degree of perpendicular thinking as contrasted with the parallelism of precedent, which, ordinarily, rides decorously with the stream and, dispensing with unnecessary judicial travail, nicely carries the burden of decision. In such a broad field the effect of judicial policy, inevitably developed, cannot be ignored. In a number of jurisdictions resale price contracts had been upheld, but there is no doubt that *Dr. Miles Medical Co. v. John D. Park Sons & Co., supra,* represented the prevailing judicial attitude toward the subject. The dissenting opinion of *Justice Holmes* in that case put the spot light on the pivotal principle: "The most enlightened judicial policy is to let people manage their own business in their own way, unless the ground of interference is very clear."

A statement of the situation which invited this reaction suggests the basic principles of court approval. "There is nothing immoral in resale price maintenance. It is one of those policies that happen to be arbitrarily prohibited by the Government. The whole foundation of trade is in maintaining stabilized prices. While it may be to the temporary advantage of a department store to increase its own sales of unbranded merchandise by using trade-marked merchandise as a leader at a cut price, yet the ultimate repercussions on commerce are of the most serious character. This has resulted in grave injury to the development of trade-marked merchandise upon which the country's commercial scheme of doing business has been largely founded. Trade-mark merchandising means merchandise that is extensively advertised, and being extensively advertised, must live up to high quality. There must be quantity production to support the expenditure of advertising with a correspondingly relatively low, but stabilized price. This gives labor steady and gainful employment, results in large purchasing power and places the stamp of identification of the trade-mark of the manufacturer on the goods with the resulting requirements of integrity in production and honor in selling for public protection. To permit the ultimate distribution of such merchandise to wreck the entire foundation of this business structure for a temporary personal profit is a shortsighted policy that should be condemned and prohibited in the strongest terms." Toulmin, Trade Agreements and the Anti-Trust Law, 1937. Statements and counter statements make a voluminous record. See hearings before Committee on Interstate and Foreign Commerce in House of Representatives on H. R. 13,305 (63rd Congress, 2nd and 3rd Sessions); H. R. 13,568 (64th Congress, 1st and 2nd Sessions).

The courts may not dispute with the Legislature any conclusion it has reached upon evidence *pro* and *con,* with regard to the verity of the economic conditions thus pictured. They are only concerned with finding whether these furnish reasonable grounds for the distinctions on which the statutes are made to depend. There seems to be little divergence of opinion on this point.

Outstanding in the rationale of the cited cases upholding Fair Trade Acts are certain key principles: The validity of the distinction between the trade-marked commodity and a commodity as such in relation to freedom of trade; the persisting property right in good will and brand after the producer has parted with the commodity; the involvement of these in resale transactions, and the paramount necessity of their protection; and the limitations in the act itself preserving competition.

We have made this approach to the case at bar because we recognize as true that: "upon this point a page of history is worth a volume of logic." *Mr. Justice Holmes* in *New York Trust Co. et al. v. Eisner,* 256 U. S., 345, 349, 65 L. Ed., 963.

The later enacted Miller-Tydings Act (August, 1937), which amends the Sherman Anti-Trust Act and the Federal Trade Commission Act (section 5), by removing resale price contracts of the nature here considered from the prohibition of the Sherman Act and declaring them not to be an unfair method of competition, renders academic any discussion of the effect of *Old Dearborn Distributing Company v. Seagram Distillers Corp., supra,* on interstate transactions, if it has any. But in sustaining the Illinois Fair Trade Act in that case the Court dealt with many questions arising under the Fourteenth Amendment and Due Process Clause of the Federal Constitution practically identical with those which have been raised in the case at bar under our own Constitution, and resolved them against the contentions of the defendant.

The first in importance of these questions concerns the Anti-Monopoly Clause of the State Constitution: Does the North Carolina Fair Trade Act create or tend to create a monopoly such as is declared in Article I, section 31, of the Constitution, to be against the genius of a free people and not to be allowed?

The Constitution speaks of monopoly—the accomplished fact—and not of the means by which it may be created. As to the former, when it is shown to exist, there can be no difference of opinion as to the duty of the Court; as to the latter, it is obvious that discriminating intelligence is required to draw the line beyond which private activity encroaches upon public convenience. A similar difference exists between the Sherman Anti-Trust Law and the Clayton Amendment. The former deals with consummated combinations and considers the purpose, reasonableness, and effect of agreements, whether offending the law. The

latter denounces acts which Congress assumes may lead to such monopolies and is made effectual by the simple process of tagging. Thornton, "Combinations in Restraint of Trade," p. 836; *Standard Fashion Co. v. Magrane-Houston Co.,* 258 U. S., 346; *Hopkins v. United States,* 171 U. S., 578, 42 L. Ed., 290; *United States v. Standard Oil Co.,* 17 Fed., 177, 221 U. S., 1, 55 L. Ed., 619.

What is monopoly? Definitions in this field are evolved under the necessity of administration and the term has been uniformly regarded as descriptive rather than precisely definitive. Without reference to the historical common law definition, this Court, in *S. v. Coal Co.,* 210 N. C., 742, 747, has given, by adoption and approval, two consistent definitions which we repeat: "A monopoly consists in the ownership or control of so large a part of the market supply or output of a given commodity as to stifle competition, restrict the freedom of commerce, and give the monopolist control over prices." Black's Law Dictionary (3d Ed.), p. 1202. "In the modern and wider sense monopoly denotes a combination, organization, or entity so extensive and unified that its tendency is to suppress competition, to acquire a dominance in the market, and to secure the power to control prices to the public harm with respect to any commodity which people are under a practical compulsion to buy." *Commonwealth v. Dyer,* 243 Mass., 472. Definitions, similar in content, are numerous.

Restraint of trade is, in many instances, no doubt, an instrument of monopoly, but it is not monopoly. Both the economic and legal history of the subject refute the assumption that any and all restraint either constitutes monopoly or necessarily leads to it. *Max Factor & Co. v. Kunsman, supra.*

The self-limiting character of the restrictions imposed by the act under review takes it out of the class of restraints which may lead to monopoly. If we concede that the term "monopoly," as used in the Constitution, covers substantial and comprehensive general control of commerce in necessary commodities, to the injury of the public, and that this may result from an unreasonable restraint of trade, we are still far from bringing the statute within its necessary condemnation, since it is lacking in the outstanding essentials of monopoly as above defined, a sufficiently extensive control of general commerce in such commodities and the resulting injury to the public; nor does it deny to any member of the public a free and equal opportunity to do anything which he might theretofore have done as a matter of common right. The freedom to do as one may wish with the good will, brand, or trade-mark of another has never been conceded by the law.

The agreements authorized by the law are vertical—between manufacturers or producers of the particular branded commodity and those

handling the product in a straight line down to and including the retailer; not horizontal, as between producers and wholesalers or persons and concerns in competition with each other in dealing with like commodities. The law does not authorize cross agreements between competitors. Whatever agreements are permitted, all face one way; they apply only to commodities produced by the manufacturer, bearing his trade-mark, brand, or name, and then only if they are in free and open competition with commodities of the same general class produced or distributed by others. The incidence of the law on trade, therefore, affects only that portion of the commodity in which the producer has already a lawful monopoly of ownership, and which goes into distribution in a volume which may be fairly measured by the popularity which the good will and identifying name have achieved, but which can never amount to the whole. *Old Dearborn Distributing Co. v. Seagram Distillers Corp., supra; Joseph Triner Corp. v. McNeil,* 363 Ill., 559, 2 N. E. (2d), 929, 104 A. L. R., 1435; *Max Factor & Co. v. Kunsman, supra.*

The proportion which the commodity affected bears to the whole is not a matter for our consideration where competition is substantial; but it must be remembered that the act applies not merely to medicinal preparations, where producers may be few, but to all commodities identified by name or brand, as to which, in many instances, competitors must be numerous. In *United States v. American Tobacco Co.,* 221 U. S., 104, 55 L. Ed., 663, and in *United States v. Standard Oil Company of New Jersey, supra,* the Government had to be content with breaking up these monopolies into a comparatively few competitive concerns.

It is not conceivable how any horizontal restriction of trade can be effected through the provisions of the statute. The restraint intended does not apply to the commodity, in its generic sense, upon which the manufacturer has expended his care and skill—it is the commodity plus the brand which identifies it, guarantees its quality, and is symbolic of the good will which rightfully belongs to the manufacturer. It is this alone which the statute desires to protect, and to the piratical use of which it applies restraint. As stated by *Justice Sutherland* in *Old Dearborn Distributing Co. v. Seagram Distillers Corp., supra:* "The ownership of the good will, we repeat, remains unchanged, notwithstanding the commodity has been parted with. Section 2 of the act does not prevent a purchaser of the commodity bearing the mark from selling the commodity alone at any price he pleases. It interferes only when he sells with the aid of the good will of the vendor; and it interferes then only to protect that good will against injury. It proceeds upon the theory that the sale of identified goods, at less than the price fixed by the ownership of the mark or brand is an assault upon the good will and

constitutes what the statute denominates 'unfair competition.' See *Liberty Warehouse Co. v. Burley Tobacco Growers Assn.,* 276 U. S., 71, 91-92, 96-97. There is nothing in the act to preclude the purchaser from removing the mark or brand from the commodity—thus separating the physical property, which he owns, from the good will which is the property of another—and then selling the commodity at his own price, provided he can do so without utilizing the good will of the latter as an aid to that end."

The common law emphasis on forestalling, regrating, engrossing and conspiracy to raise prices must not lead us to infer that the sole objective of public policy was to obtain the lowest possible price to the consumer on every commodity. That is both an economic fallacy and a misconception of law. The public is more interested in fair and reasonable prices which preserve the economic balance in advantages to all those engaged in the trade, with due regard to the consuming public, than it is in securing the lowest obtainable prices, when the inevitable tendency is to degrade or drive from the market "articles which it is assumed to be desirable that the public should be able to get." (*Justice Holmes,* dissenting in the Dr. Miles case.) On this phase of the subject the Supreme Court of the State of Washington, in *Fisher Flour Milling Co. v. Swanson,* 76 Wash., 649, 137 Pa., 144., 151, observed: "Finally it seems to us an economic fallacy to assume that the competition which in the absence of monopoly benefits the public is competition between rival retailers. The true competition is between rival articles. Fixing the price on all brands of high grade flour is a very different thing from fixing the price on one brand of high grade flour. The one means destruction of all competition and of all incentive to increased excellence. The other means heightened competition and intensified incentive to increased excellence." Our own laws implementing this section of the Constitution recognize that price-cutting, not born of fair or normal competition, may indeed be piratical, and a dangerous step toward monopoly. C. S., ch. 53, sec. 2563; *S. v. Coal Co.,* 210 N. C., 742, 188 S. E., 412.

No one has a vested interest in the common law. *Hurtado v. California,* 110 U. S., 516, 46 L. Ed., 697. The common law, proceeding *ex proprio vigore,* prior statutes, and public policy growing out of them, all must yield to the superior authority of the later enacted statute. Nor do we think that any contribution which the common law has made to the Constitution has given to the term "monopoly" a rigor inconsistent with the foregoing reasoning. Any definition of "monopoly" which may be built up by aid of the common law rules against restraint of trade must carry with it those exceptions favoring agreements for the protection of good will—which had become an established doctrine of the

common law long before our first Constitution was adopted—and the concomitant principle that the reasonableness of the restraint must be measured by the adequacy of the protection necessary, even though it extends to the limits of the kingdom, if the good will has become national in extent. Thornton, Combinations in Restraint of Trade, pp. 60-71; *Leather Cloth Co. v. Lorsant,* L. R. 9, Eq. 345, 39 L. J., ch. 62; *Maxim Nordenfeldt v. Nordenfeldt,* L. R. 1, ch. 630, 651, 67 L. T., 177; Aff. A. C., 535, 63 L. J., 908, 71 L. T., 489; Benjamin on Sale, 7th Ed., pp. 536-546. It is as well to observe that while these cases relate to the protection of good will upon alienation, the same principle may fairly be extended to the protection of that good will while in the enjoyment of the original owner. There is no sound reason why it should be called into service only when it might serve as an obituary to his possession, or merely as a more effectual means of delivery. The real purpose is to protect the owner of the good will against assault from the most dangerous quarter.

In this and other jurisdictions this doctrine of the common law has been invoked not infrequently to modify the rigor of anti-monopoly statutes and to permit interpretation in the light of reason. *Mar-Hof Co., Inc., v. Rosenbacker,* 176 N. C., 330, 97 S. E., 169; *Morehead Sea Food Co. v. Way & Co.,* 169 N. C., 679, 86 S. E., 603.

The inconsequential margin over which the courts have battled is apparent on comparing the utmost this law can do with what the courts have already approved. The cumbersome and ineffective device of agency contracts fixing prices of retail sale have usually been upheld by the courts on the *alter ego* doctrine, which makes the producer the final seller. *United States v. General Electric Co.,* 272 U. S., 476, 71 L. Ed., 362. The doctrine itself is impeccable, but the reality of the device when applied to a distribution which the parties probably regard as final between themselves, and certainly desire to be so, is open to challenge. The point is that such a transaction has precisely the same incidence on the freedom of trade as does the present act, since it monopolizes exactly the same commodity—not merely *in quantum,* but in physical identity—and is nearer to monopoly in principle because it concerns the commodity as such. It illustrates the triumph of form over substance and leads to the thought that the producer always might have had the relief sought if he could come into court clothed in more formal and traditional habiliments.

Perhaps the most direct answer to the charge of monopoly made against this statute is contained in the provisions of the statute itself, under which it automatically ceases to operate where there is no competition. In a late case, *Goldsmith v. Johnson & Co.,* Maryland Court of

Appeals, 28 June, 1939, decided since the case at bar was argued before this Court, this was thought to be a sufficient answer, and with this we agree.

We are not unmindful of the constitutional imperatives upon which the defendant insists. But first it is necessary to understand what the Constitution requires. It is as little as we can do, out of respect to its framers, and the obvious purposes of such an instrument, to regard it as a forward-looking document, anticipating economic as well as political conditions yet to emerge. It is not a statute. Its concepts worthy of surviving are fundamentally stated and must be sufficiently generic and comprehensive to allow adjustment to the current needs of humanity. In this way only can we interpret it in terms of social justice so necessary to maintain its usefulness and to continue it in the public respect. The Anti-Monopoly Clause of the Constitution is couched in terms to meet this requirement. Like other clauses similarly phrased, it expects implementation by statute. Its terms are broad enough to afford recognition of the principles we have discussed, and the law is safely within the constitutional admonition.

Article I, section 17, of the Constitution provides: "No person ought to be . . . disseized of his freehold, liberties or privileges . . . or in any manner deprived of his life, liberty, or property but by the law of the land." It is contended that the statute delegates the power to fix the resale price on another's property, or directly or mediately fixes the price on a commodity at private sale with a like effect, in violation of this section. This is the objection repeatedly raised in the above cited cases under the similar provisions of the Federal Constitution. It has not received favorable consideration by the courts. *Old Dearborn Distributing Co. v. Seagram Distillers Corp., supra; Bourjois Sales Corp. v. Dorfman, supra; Pyroil Sales Co. v. The Pep Boys, supra.*

The restriction is not imposed after the acquisition of the property, and is not in derogation of an existing or established right. Under the statute it was a condition that had already attached to the property. It was known to the prospective purchaser, and he was under no obligation to assume it. Morally and legally he is presumed to have accepted the condition by his voluntary act of purchase.

As to the delegation of power, we do not understand that it is contended there is any delegation of the legislative function. On the face of it such a contention is untenable. The statute was complete when it left the hands of the Legislature. It required no person or group of persons or other external agency to further authorize it or put it in force. *Weco Products Co. v. Reed Drug Co., supra.*

But the law "delegates" nothing. At the most it lifts the ban supposed to exist by virtue, largely, of public policy, against contracts fixing

LILLY & CO. *v.* SAUNDERS.

the resale price, and permits this to be done by contract between the manufacturer or producer and the purchaser, and does this partly in recognition of the continuing property right of the producer in the good will of his business which is involved in the transaction through the use of the symbolizing brand and partly in the recognition of the rights of others, including the honest purchaser, who expects to put these to a legitimate use in the resale of the branded commodity and loses money when it is cheapened by use as a bait for other sales. It is made binding on a purchaser who buys with a knowledge of the condition attached to the purchase.

"The statute is not a delegation of power to private persons to control the disposition of the property of others, because the restrictions already imposed with the knowledge of the prospective reseller runs with the acquisition of the purchased property and conditions it." 11 Am. Jur., p. 933; *Old Dearborn Distributing Co. v. Seagram Distillers Corp., supra; Joseph Triner Corp. v. McNeil, supra.*

The resale price is not fixed on any commodity, as such, and with respect to these the traditional rules demanding freedom of trade remain uninvaded. It is placed only on the branded commodity; and this Court, with the great majority of those which have preceded us in passing on similar laws, is of the considered opinion that the distinction is valid. Fixing the price, usually the most important incident of bargaining, and still so when the parties are equally related to the subject of the transaction is, in this instance, merely ancillary to the purpose of the law, which is to protect both the producer and the public—the one with respect to his good will, the other with respect to the quality and integrity of a desirable product. The restriction is imposed, as we have said, more with respect to the good will and brand than to the limited quantity of product, as such, which passes in the sale. A frank recognition of their relative importance demands that the minor consideration should give way, *ut res magis non pereat.* Laws protecting trade-marks, trade-names and brands from piracy are of no avail whatever when the abuse of them by a purchaser of branded products is uncontrolled. The producer is less hurt by pilfering than he is by sabotage.

"There is nothing sacrosanct about price." The right of the owner to fix a price on any commodity he sells is not absolute. To illustrate, if that were true the Second Section of the Robinson-Patman Amendment, standardizing prices by prohibiting discriminations, would array that act against both the Fourteenth and the Fifth Amendments to the Federal Constitution. It is a right created by law and subject to control by law when necessary to the just and orderly administration of government, with due regard to constitutional guaranties. Price restrictions

stand upon the same challenge before the law as any other restraint upon the use of property, and are concerned with the same constitutional provisions.

*Nebbia v. New York,* 291 U. S., 502, 78 L. Ed., 940, deals with governmental price-fixing and the fixing of that price on a general commodity having nothing to do with trade-mark or good will. But even so, the Court declined to limit the formula "affected with the public interest" to any business particularly constituted, as, for example, public utilities and the like, and held that a business was "affected with the public interest" when, for adequate reason, it was subject to control for the public good, making the final test to be whether the law was arbitrary in its operation and effect. See analysis of this case in Toulmin, Trade Agreements and the Anti-Trust Laws, p. 103. The marked tendency of the courts to discard the formula altogether as not being sufficiently definitive to distinguish the field of application is noted in the annotation to *Miami Laundry Co. v. Florida Dry Cleaning and L. Bd.,* 119 A. L. R., 956, 985. The subject seems of little application here, since the same court in *Old Dearborn Distributing Co. v. Seagram Distillers Corp., supra,* held that the Illinois act, which, as we have stated, is practically identical with ours at this point, does not constitute governmental price-fixing or, indeed, price-fixing in any sense offensive to the Constitution. By specific reference it distinguished from the case under consideration those cases referring to price restriction as an unconstitutional invasion of property right, holding that they had no application to the sale of branded commodities protected under the act. *Old Dearborn Distributing Co. v. Seagram Distillers Corp., supra,* at page 192.

Such a restriction is not confiscatory unless it is unreasonable or contrary to the principles of the Constitution reasonably interpreted; and one who invokes the aid of the Constitution in this respect must show that he has a title free from condition, at least with respect to the supposed invasion. This is not the position of the defendant.

We may concede that such a restriction upon the sale of a quantity of a commodity which has no distinction other than it belongs to the seller, where the seller parts with everything he has in it, and the commodity merges indistinguishably in the stream of trade, has always been considered against public policy, unlawful, confiscatory, unconstitutional, or, to sum it up in traditional style, "odious." But surely we have come a long way on this road since the *John Dyer case* (2 Henry 5, 5b, pl. 26), when the irate judge dismissing an action on a bond given upon a contract in partial restraint of trade said of the plaintiff: *"Et pur Dieu si le plaintiff fu icy, il ira al prison tanque il ust fait fine au roy."* Now the courts permit the law to do its own frowning, thus eliminating as a factor of decision the seductive influence of judicial pietism. Not

arbitrarily, but on principle, they recognize the wide difference between the sale of a general commodity, around which the rules of law were originally built up, and the sale of a trade-marked commodity, the very essence of which is the reputation of the product, the good will of the producer, the protection of which is necessary both to him, to the honest retailer, and equally important to the public, since under our highly developed long distance system of production and distribution it often affords the only available guaranty of quality. *Rabb v. Covington,* 215 N. C., 572. It is no longer a matter of trend—the thing lies within the beaten path of judicial decision. We are free to say that if the matter had been presented to us independently, without the aid of these authorities, we would not be disposed, in the face of the statute, to further adhere to a purely doctrinary point of view which now makes no contact with the subject otherwise than at very minor points of consideration, if at all. Forcing new situations into old categories is like putting new wine into old bottles. It strains the bottle.

In our opening analysis we stress the fact that the producer and seller of a branded commodity, along with the commodity itself, transfers the use of the good will, which use is made effectual by the use of the distinguishing brand or trade-mark. The quantity of commodity corporeally passed by the sale is always a relatively unimportant item, but the entire good will of the producer's business, with all of its force and effectiveness, is put behind the product in the hands of the retailer for use in inducing consumer purchase; and, conversely, the entire good will may be appropriated and prostituted by the cut rate dealer who uses it, not to promote the sale of the branded commodity, but to increase his sale in other commodities. In either case the entire good will is involved, and in a very real, if not technical, sense subjected to a servitude. On this principle there is no sound reason why, under favoring legislation, the parties should not be permitted to bargain with reference to the conditions upon which this servitude may be imposed, and none why this may not take the form of an agreement as to the resale price, the maintenance of which is to their mutual advantage. Some of the decisions find support for the provisions similar to those contained in Section Six in the principle that outside interference with such a contract is a proper subject for statutory prohibition, since, in somewhat similar circumstances, the Court itself has afforded relief.

In *Port Chester Wine and Liquor Shop, Inc., v. Miller Bros. Fruiters, Inc.,* decided by the Appellate Division of the New York Supreme Court on 28 January, 1938, an action by a retail dealer against another retailer cutting resale prices was sustained under a similar act. Without deciding that particular question here, the situation is at least illustrative of the soundness of the law, and we may infer from the agreed facts here

that a similar situation may exist among retailers who have complained to the plaintiff of the prevalence of this practice and threatened to discontinue handling the brands.

The power of the Legislature to pass a law of this nature has been questioned in view of Article II, section 29, of the Constitution, reading in part: "The General Assembly shall not pass any local, private, or special act or resolution relating to . . . regulating labor, trade, mining or manufacturing." It is contended that the exceptive provisions of section 5 so reduce the field of its application as to make it a special act forbidden by this clause of the Constitution.

The Constitution does not prohibit the Legislature from regulating trade in any of its branches or regulating it in any particular. It merely forbids such regulation by private, special, or local law. A general law is not rendered special because there has been excepted or excluded from its operation either persons or things to which, upon reasonable classification, according to the purposes of the law, it should not be applied. Such exceptions or exclusions must be germane to the purposes of the act, be founded on reasonable distinctions, and must leave, as a properly distinguishable class, all those persons or things which in the reasonable exercise of legislative discretion ought to be included, leaving out only those persons or things which may, with the same propriety, be excluded. The classification degrades the law only when it has no basis in reasoning or, otherwise expressed, is arbitrary and capricious. This statute does not attempt to validate all contracts containing resale price agreement, and it is just as assailable as a special law on that account as it is because of its express exclusions, if classifications are to be made by its antagonists on grounds even less reasonable than those which commended themselves to the Legislature. The law was intended to apply only to contracts and sales of a certain kind which it is the business of the statute to define. It need not follow any particular formula in doing so. It must be considered as a whole and the exceptions, germane to the purpose of the act and based on recognizable and reasonable distinctions, merely form a part of the process of classification. In our opinion they are so grounded. 59 C. J., pp. 732, 735, sections 319, 322; *Scarborough v. Wooten,* 170 P., 743, 23 N. M., 616; *State v. Atchison P. & S. F. Ry.,* 151 P., 305, 20 N. M., 562. The exceptions refer to conditions which the dealer is likely to experience if no such law was ever enacted, and the transactions are well outside of normal trade, to which the statute was intended to apply.

The violation of the law is made "actionable at the suit of any person damaged thereby." Under such general authorization an action to permanently restrain defendant from the practices complained of is proper, and the agreed facts afford sufficient ground for relief.

It has been suggested that the conduct of plaintiff in permitting a sale to the defendant, who refused to sign any contract fixing the resale price, is sufficient to estop it from equitable relief; but the evidence does not disclose that the plaintiff made any inducement to the defendant or gave him any reason to believe that the plaintiff intended to waive any of his rights under the law. It was optional with the plaintiff whether it obtained the contract or relied upon the statute, and the simple act of sale to defendant, without stipulating a resale price, did not carry with it an assumption that the defendant might violate the law or confer upon him the right to do so. If the law itself is valid, and we hold it to be so, it is a public statute which the defendant was bound to have in contemplation when he made the purchase.

In *Lentheric, Inc., v. Weissbards,* 122 N. J. Eq., 573, 195 Atl., 818, the argument was successfully made that where the plaintiff refused to sell to the defendant he was estopped in equity to assert his claim when defendant had obtained his goods elsewhere. Here we are confronted with the direct opposite of that argument. In our opinion, neither has merit.

Rather much argument was addressed to the court on the contention that defendant was making a reasonable profit on the sale of the products listed in the agreed facts. However such circumstance might affect the result on a trial for violation of some anti-trust law, where the effect on the public might be an issue, it cannot be considered here in the face of the statute, which it would completely defeat. The standard set is not one of reasonable profit, but of resale price.

Nor is relevant the fact that prices on commodities described under Class III, which have been fixed by competing distributors, are within one cent of parity. In the absence of agreement to that effect this has not been considered by this Court as sufficient even to support a charge of violating the Anti-Monopoly Statute. *S. v. Oil Co.,* 205 N. C., 123, 126, 170 S. E., 134, and the Supreme Court of the United States is in accord. *United States v. American Tobacco Co., supra.* This might occur through an unlawful agreement, certainly, if at all, *dehors* the operation of this law, or it might be the result of close competition as is now the case with the price of gasoline by the major oil companies, or it might be a case of "follow the leader," and it is not a violation of any law to copy the prices of a competitor.

We have nothing to do with the expediency of an economic experiment. Discussions of this subject, on which thousands of articles have been written and hundreds of arguments made, has left the lawmaking bodies and most of the courts convinced that there is a field here in which the protection of private right and the promotion of the public

welfare are not in irreconcilable conflict. The statute represents an attempt of the General Assembly to harmonize and apply these principles. In our opinion the provisions of the Constitution called to our attention do not defeat that legislative power. The propriety of its exercise is within the legislative discretion.

We conclude, therefore, that the statute under review is a constitutional and valid expression of the legislative will, and as such must be enforced.

The plaintiff is entitled to the relief prayed for in its complaint and judgment in the court below will be entered in accordance with this opinion.

The judgment is
Reversed.

BARNHILL, J., dissenting: The facts in this record, interpreted in connection with the legislation under consideration, are such that I find it impossible to concur in the majority opinion.

It is admitted that:

Plaintiff does not sell its commodities to retailers. It sells to wholesalers who in turn supply the retail dealers. It does not cater to the general retail trade in advertising its products to the consuming public, nor recommend nor encourage the resale of its products by retail druggists to members of the consuming public. Its policy of distribution is predicated upon the theory that medicinal products such as those manufactured, distributed and sold by the plaintiff should be used only under the supervision of a physician. It merely recognizes "the right of the retail druggist to resell certain of plaintiff's manufactured products directly to members of the public where not prohibited from making such sales by state or federal laws." Defendant was not guilty of any fraud or deception in acquiring the merchandise it retailed and it has not engaged in "price-cutting" as that term is ordinarily understood, but is making a reasonable profit. By the enforcement of the statute defendant will be required to increase the cost of the merchandise sold by it to the consuming public—arbitrarily and against its will—by at least eight per cent.

It further appears that: (1) Although the statute in question authorized it so to do, the plaintiff did not elect to bind itself to sell its commodities only to wholesalers who in turn contracted not to resell the same to retailers except upon contract to observe the stipulated minimum price. Instead plaintiff sold or permitted the sale of its commodities to the defendant knowing that the defendant had refused to enter into the stipulated contract or to regard the stipulated price. (2) Plaintiff undertook to classify customers in a manner not authorized by the

statute and to make the contract apply to only a part of the purchasing public. (3) Defendant by conducting a "cash and carry" business and by other efficient business practices is conducting its business at a cost less than that incurred by the average retailer and is seeking to pass on some of the benefits to the consuming public.

Plaintiff now seeks to impose upon noncontracting retailers the duty to observe the minimum prices provided in its contract with certain retailers. It proceeds under the terms of ch. 350, Public Laws 1937, known as the Fair Trade Act. The majority approves as constitutional this statute which not only validates price fixing contracts between manufacturers and retail distributors, but likewise makes such contracts binding upon other retail dealers not parties to such contracts.

As a result of this decision retail distributors who by conducting a "cash and carry" business and by other expense reducing business methods and practices are conducting their business at a cost less than that incurred by the average retailer and who are able and willing and are seeking to pass on some of the benefits to the consuming public by offering its merchandise at a lower price are compelled to sell to the public at an artificial and higher price than that which normally would be fixed by the forces at work in a competitive commercial world. This is price pegging with a vengeance—and the consuming public is compelled to pay an additional tribute to the retailer which the retailer himself does not want. The effect of this act goes well beyond what has been called "predatory price-cutting" for it fixes prices irrespective of the motives or purposes of the retailer in reducing prices, by shaving his margin of profit or otherwise. It promotes the establishment of manufacturer monoplies and retailer combinations in restraint of competition. It penalizes the initiative and efficiency of alert retailers and rewards the incompetent or inefficient. It increases prices demanded of the consumer. It aids one class of retailer against another competing class who through more efficient business methods are able to undersell—at a fair profit—their competitors. It is in a final analysis a shot aimed at a particular group of retail merchants—but unfortunately the load thereof strikes and inflicts a telling wound upon the mass of people who compose the consuming public. To the retailers it means elimination of price competition and better profits—to the consumer it means the loss of the benefits arising out of wholesome price competition, and it produces still higher cost of living.

Under an economic system founded upon competition every general restriction—that is, every restriction covering all or a controlling fraction of a given commodity—is essentially unreasonable, being neither fairly necessary to the protection of the manufacturer, who already has a monopoly, nor beneficial to the public, because it does not tend to

create an incentive to increase the excellence of the product in order to maintain the better price.

Nor are these social, economic and political weaknesses of the statute the only objections. There are reasons, both legal and equitable, why the plaintiff may not maintain its action.

The plaintiff is not entitled to equitable relief.

The act is declaratory of the public policy of the State. Enforcement thereof rests upon the Attorney-General and the solicitors of the State, except as otherwise expressly authorized in the act. It authorizes individual trade-mark owners to sue only in the event they are damaged by the action of a retailer in selling at less than the fixed price, and the plaintiff alleges no facts upon which the allegation that it has suffered damages may be predicated. It sells to wholesalers and not to retailers. So far as this record discloses, it is selling the same quantity at the same margin of profit as heretofore.

The statute does not authorize injunctive relief against threatened damage. In that connection plaintiff alleges that the contracting retailers are threatening to cancel contracts and it will thereby suffer irrevocable damages. Even if the plaintiff is authorized to seek injunctive relief this is a false premise as the contract expressly reserves in the retailer the right to cancel the contract. The cancellation thereof is the exercise of a right and not the commission of a wrong. It gives no cause of action, but is *damnum absque injuria.*

A retailer who is not a party to a price fixing agreement between the manufacturer and other retail dealers, does not, by selling such manufacturer's products below the retail price designated in such agreement, induce such other retail dealers to breach their agreement, and, consequently, the manufacturer may not enjoin him on that ground. The defendant is merely selling products at prices lower than those agreed upon by the plaintiff and other retailers. The fact that incidental thereto some of the contracting retailers may breach their agreements in order to meet competition cannot be laid at the door of this defendant in an attempt legally to charge it with the result of such breach. *Coty v. Hearn Department Stores,* 284 N. Y. S., 909.

The contracting retailers voluntarily entered into the stipulations contained in the contract. They may voluntarily abandon such contracts whatever the motivating cause of such abandonment may be. The plaintiff cannot complain that retailers are exercising or threatening to exercise this right and it suffers no damage by reason thereof. There is no suggestion in the record that the plaintiff will not sell the same quantity of merchandise to wholesalers as heretofore or that it will be required to sell at a less price. Therefore, there is no threatened damage.

Plaintiff does not come into court seeking equity with clean hands, but has put itself in a position which is destructive of its right, if any existed, to appeal to a court of chancery for relief.

It did not contract with retailers—as the act authorizes—that it would sell only to wholesalers who agreed to resell only to retailers who contracted to observe the stipulated price. It did agree to "use every reasonable means" permitted by law "to prevent the sale . . . at less than the minimum resale price" by others. In violation of this agreement on its part it put its commodity on the market for unrestricted sale and sold, or permitted the sale, to the defendant unconditionally, although it knew that the defendant had refused to sign the contract and had declined to agree to observe the stipulated price in the future. The defendant purchased plaintiff's commodities from recognized wholesale dealers in plaintiff's merchandise, which wholesale dealers the plaintiff could have bound—but did not—to sell only to those who agreed to observe the stipulated minimum price. Defendant purchased unconditionally under the circumstances indicated. It was guilty of no fraud or deception in the acquisition of title to the property. Necessarily, under the circumstances of this case, the plaintiff was a party to such acquisition in violation of its contract with other retailers. It was a party to the acquisition by the defendant of its commodities on an unconditional and unrestricted basis when the plaintiff had the right to contract not to sell to wholesalers who would resell to retailers who did not agree to observe the stipulated price, and it had the right in the first instance to sell only to those who agreed to observe such prices. Having been a party to the sale of the commodities to the defendant on an unrestricted basis in violation of the terms of its contract it should not now be heard in chancery to insist that the defendant deal with such commodities on a restricted basis, or to assert that in fact the commodities were acquired by the defendant conditionally.

It may be argued that the defendant in the facts agreed has stipulated away its right to insist that plaintiff has no standing in a court of equity. As to that I take the position that equity jurisdiction was conferred upon the courts with the laudatory purpose to make it possible to render justice to a litigant in the absence of a statute protecting his rights, to the end that no wrong should exist without a remedy. It was never intended that equity should aid a litigant to obtain an unjust end and the court *sue sponte* should refuse to entertain a suit, as here, where the claimant has himself failed to do justly and his own conduct has caused the condition about which he complains.

The act constitutes an unlawful and unconstitutional delegation of authority to fix standards of fair practice.

Section 6 makes it an act of unfair competition for a retailer to sell a commodity at a price less than the minimum stipulated in a contract

between some other retailer and the manufacturer or distributor. We merely look to the contract to determine what the standard of fair practice is below which the statute provides he shall not sell, and so, the standard is fixed by the manufacturer or distributor. Thus, noncompliance with the terms of the contract is made an act of unfair competition with the right in the manufacturer or distributor to set the standard of unfair competition. This is nothing more than a species of delegated authority.

Even if it be granted that the General Assembly may directly fix retail sales prices generally (an assumption not supported by the decided cases) it by no means. follows that the General Assembly may delegate to private individuals the power to so affect the property rights of other retail dealers. Nor does it seem to me a sufficient answer to say that such a delegation of power merely permits the owner of a trademark or patent to protect his property by directing the resale thereof after he has parted with title thereto. As I later set out, it has long been settled that such patent or trade-mark owner may stipulate only as to the first sale of his product, but thereafter he has lost possession of his product by releasing it into the channels of commerce generally. He may not control the manner in which, or the price at which, later sales of his product are to be made. *Bement & Sons v. National Harrow Co.,* 186 U. S., 70; *Motion Picture Patents Company v. Universal Film Mfg. Co.,* 243 U. S., 502, and cases therein cited.

The extent to which legislative power may be delegated has heretofore been ably discussed by the present *Chief Justice,* who has defined, as clearly as the subject permits, the strict limitations imposed upon the General Assembly in delegating its powers. *Provision Co. v. Daves,* 190 N. C., 7. As developed in that case, the proposition that a General Assembly may not delegate its legislative powers is subject to three exceptions only; namely, (1) limited powers as to local legislation may be granted to municipal and *quasi*-municipal corporations; *State v. Simons,* 32 Minn., 540, 543; (2) limited powers to promulgate administrative regulations may be granted to recognized governmental agencies and instrumentalities; *S. v. Garner,* 158 N. C., 630; *S. v. R. R.,* 141 N. C., 846; and (3) limited powers as to the finding of facts may be granted to recognized governmental agencies and instrumentalities where the determination of certain facts may be essential conditions precedent to the invocation of particular laws; *S. v. R. R., supra; S. v. Hodges,* 180 N. C., 751; *Morgan v. Stewart,* 144 N. C., 424; *S. v. Dudley,* 182 N. C., 822; *Field v. Clark,* 143 U. S., 649. It is instantly apparent that the present case falls within neither of these three exceptions, as the delegation of the power to fix standards and prices here involved is made to private individuals (*i.e.,* manufacturers and retailers) and not to any governmental agency or instrumentality.

The delegation of price fixing power fails for a second reason, *i.e.,* no standard or yardstick to be used in fixing the prices is laid down in the act. Every delegation of power, to be upheld, must, in granting the power, lay down a "primary standard" (*Buttfield v. Stranahan,* 192 U. S., 470, 496; *Red "C" Oil Co. v. N. C.,* 222 U. S., 380, 394), or a "general rule" (*Union Bridge Co. v. U. S.,* 204 U. S., 364, 386) to be followed in discharging the delegated power. This "primary standard" or "general rule" serves a three-fold purpose; it clarifies the purpose and intent of the law, furnishes a measure of the power granted, and fixes the limits within which the power may be exercised. Nor have the requirements in this respect been recently relaxed. In *Panama Refining Co. v. Ryan,* 293 U. S., 388, 415, it was declared that, whenever there is an attempted delegation of power, the legislative body must "perform its function of laying down policies and establishing standards" where it attempts to leave to "selected instrumentalities the making of subordinate rules within prescribed limits and the determination of facts to which the policy as declared by the Legislature is to apply." There it was stated, at page 415, that the fatal weakness of the N. I. R. Act was that it was a grant of "unlimited authority to determine the policy and to lay down the prohibition, or not to lay it down." The instant Fair Trade Act has a similar shortcoming. It grants to private individuals the right to fix prices without laying down any standard or fixing any limits regulating those prices, and, further, it leaves entirely to certain individuals the choice as to whether minimum resale prices shall be fixed or not—which right some of such individuals may choose to exercise while others decline to do so. The constitutional requirement that there shall be a "primary standard" or "general rule" was again affirmed in *Schechter Corp. v. U. S.,* 295 U. S., 495, 541, where it was declared that the attempted delegation of power was unsuccessful because the legislative body failed "to prescribe *rules of conduct* to be applied to particular states of fact determined by appropriate administrative procedure."

It may be said further that the statute is arbitrary, discriminatory and unreasonable as applied to one who not being a party to such a contract sells products of a manufacturer at a price lower than that designated by the manufacturer between it and other retailers, because it attempts to compel one not a party to a price fixing contract to sell at prices fixed by others. *Doubleday D. & Co. v. Macy & Co.,* 269 N. Y., 272, 103 A. L. R., 1325; *Seeck & Kade v. Tomshinsky,* 269 N. Y., 613; *Coty v. Hearn Department Stores,* 284 N. Y. S., 909.

In this connection, it may be noted that the act is objectionable for the further reason that it does not necessarily apply to all trade-mark owners, producers and distributors. It becomes operative only as to those who elect to contract—binding noncontracting retailers dealing in

the same commodities. Likewise, it not only authorizes such trade-mark owners as elect to do so to contract to fix such standards, but they are authorized to change the standard from time to time, so that what constitutes unfair competition today may by the act of the distributor in reducing prices be perfectly lawful tomorrow. What is unfair competition may thus vary from time to time at the will of the distributor.

To restate concisely, this act fails as an attempted delegation of power in that (1) legislative power may only be delegated to governmental agencies or instrumentalities, not to private individuals (as here attempted), and (2) a delegation of legislative power must always be accompanied by a statement of a "primary standard" or "general rule" regulating and limiting the exercise of such power, and such a "primary standard" or "general rule" is lacking here where there is a blanket grant of power to manufacturers and some retailers to fix prices which will be binding upon all retailers and consumers.

The act is essentially a price fixing statute.

If considered without regard to section 6 thereof the Act might well be sustained on the theory that it merely changes the common law rule and makes lawful contracts fixing minimum retail prices. When considered as a whole it goes far beyond this purpose and becomes essentially a price fixing statute. The noncontracting retailer is not required to sell at not less than a stipulated price by reason of the contract. He is compelled so to do by the act. We merely look to the contract to determine what the minimum price is, below which the statute provides he shall not sell.

If we consider the statute general in nature and of necessity all-embracing, then it fixes, or permits the fixing of retail prices as well where the evils of price-cutting are absent as where they are present. Such a law which in effect spreads an all-inclusive net for the feet of everybody upon the chance that while the innocent will surely be entangled in its meshes some wrongdoers also may be caught is not permissible. *Tyson & Bro.—United Theatre Ticket Offices v. Banton,* 271 U. S., 418, 429.

The Legislature is not only without authority to delegate to a private individual or a corporation the right to fix prices, it is without constitutional power to fix prices at which commodities may be sold, services rendered, or property used, unless the business or property involved is "affected with a public interest." *Chas. Wolff Packing Co. v. Court of Industrial Relations,* 262 U. S., 522.

Legislative price fixing is an unconstitutional restriction upon the right of a private dealer to fix his own prices. *Fairmont Creamery Company v. Minn.,* 274 U. S., 1, 71 L. Ed., 893; *Williams v. Standard Oil Co.,* 278 U. S., 235, 73 L. Ed., 287; *Chas. Wolff Packing Co. v.*

*Court of Industrial Relations, supra; Ribnik v. McBride,* 277 U. S., 350, 72 L. Ed., 913; *New State Ice Co. v. Liebmann,* 285 U. S., 262, 76 L. Ed., 747.

By virtue of sec. 6 of the Act, when a manufacturer and a single North Carolina retailer contract to maintain a price schedule for the resale of trade-marked or identified products, such price schedules become binding upon all other North Carolina retailers of these products. Accordingly, A. by contracting with B. can compel C. and D. to sell A.'s goods at prices agreeable to A. and B. but not agreeable to C. and D. Thus, A. and B. seek to achieve by mandate of law what they cannot achieve by contract with C. and D. The effect of the act is to extend the manufacturer's ownership of commodities marketed by it under a distinguishing trade-mark, brand or name after he has sold them into the normal channels of commerce, with the result that the dealer-purchaser loses the right to sell his goods bought for resale at figures of his own choosing. This right to fix the price at which one will sell his property is itself a well recognized property right. *Tyson & Bro.—United Theatre Ticket Offices v. Banton, supra; Wolff Packing Co. v. Court of Industrial Relations, supra; Ribnik v. McBride, supra; Williams v. Standard Oil Co., supra; New State Ice Co. v. Liebmann, supra.* As these cases point out, this property right is one which a General Assembly may not destroy by fixing mandatory prices. Granted that such resale price maintenance contracts as here considered may be validated by the General Assembly as to the contracting parties, when the effect of the act (as here) is to make that price schedule binding upon other and noncontracting parties, as to these latter parties the Act constitutes price fixing by legislative mandate. Whether the prices are fixed by the Legislature directly or are made binding by act of the Legislature in delegating the power to fix prices to private individuals, the prices when fixed become binding upon an unwilling citizen.

Under the doctrine of *Wolff Packing Co. v. Court of Industrial Relations, supra,* the power of a legislature to regulate prices was specifically limited to those businesses which are distinctly "clothed with a public interest." Further, as explained in *Nebbia v. New York,* 291 U. S.; 502, 507, "clothed with a public interest" is synonymous with "affected with a public interest" and as such refers to those businesses so definitely tinged with a public interest that they are rendered subject to the exercise of the police power. As that case points out, there are but three types of businesses which may be termed "clothed with a public interest": (1) Certain businesses which historically, and somewhat arbitrarily have long been so considered; (2) businesses operating under public grants and franchises imposing the duty to serve any member of the public demanding same; and (3) businesses which, by reason of their

peculiar relation to the public, are regarded as having granted to the public extensive powers of regulation.

Since the instant Act is not limited to particular trades, but extends to all retailers selling goods bearing trade-mark, label or name, it is apparent that there was no legislative intent to limit the act to those businesses affected or clothed with a public interest. Since it does not appear that there was a legislative intent to declare any retail businesses clothed with a public interest and since it is impossible to determine from the act which retail trades the Legislature intended to be regarded as such, in my opinion, this Court is without power to select the retail drug business (as would be necessary in the instant case) and pronounce it to be such a business, and the majority opinion does not undertake to do so.

To restate more concisely, this Act fails in that, (1) it destroys a property right of retail dealers, *i.e.,* the right to fix the prices at which they will sell their goods, and (2) it does not purport to declare any retail business clothed or affected with a public interest so as to justify price fixing within that business, and without such a declaration every price-fixing act is invalid as being outside the constitutional exercise of the police power.

The statute is in conflict with N. C. Const., Art. I, sec. 17.

As heretofore pointed out, the right of the owner of property to fix the price at which he will sell it is an inherent attribute of the property itself.

The whole spirit and purpose of the Constitution is to protect the liberties and property rights of the citizens of the State. Any act which arbitrarily destroys or impairs the right of the individual to the free use and enjoyment of his property for the benefit of a special group in order to permit this group to fix prices is diametrically opposed to the genius of a free people and should not be allowed to stand. The act under consideration is an attempt by legislation to deprive the non-contracting retailer of this right to the free use and enjoyment of his property and is in direct violation of N. C. Const., Art. I, sec. 17.

The act is a special act relating to trade.

N. C. Const., Art. II, sec. 29, provides that: "The General Assembly shall not pass any . . . special act . . . regulating . . . trade . . . or manufacturing . . . any local, private or special act or resolution passed in violation of the provision of this section shall be void." The effect of this provision is to render void any act regulating trade or manufacturing which is not a general law. *S. v. Dixon,* 215 N. C., 161. The word "trade" has been frequently defined by this Court and its legal significance is discussed in the *Dixon case* at page 164. It comprehends "not only all who are engaged in buying and

selling merchandise, but all whose occupations or business it is to manufacture and sell the products of their plants. It includes in this sense any employment or business embarked in for gain or profit." *S. v. Worth,* 116 N. C., 1007, 21 S. E., 204. As the present act seeks to regulate contracts and sales relating to retail trade in commodities not "affected with a public interest," the act, it seems to me, falls squarely within the constitutional prohibition, unless it can be held to be a general law. What, then, is a "specific" law? It is one which does not include all of the persons within a given class, but relates to less than the entire class, or one which relates only to a particular section of class, either particularized by the express terms of the act or separated by any method of selection from the whole class to which the law might but for such limitation be applicable. *Arps v. Highway Commission,* 90 Mont., 152, 300 P., 549; *City of Springfield v. Smith,* 322 Mo., 1129, 19 S. E. (2nd), 1; *State ex rel. Powell v. State Bank,* 80 A. L. R., 1494; *R. R. v. Cherokee County,* 177 N. C., 86. A law is a special law if it imposes particular burdens or confers special rights, privileges or immunities upon a portion of the people of the State without including therein and being applicable to all of the class throughout the State. *Mathews v. City of Chicago,* 342 Ill., 120, 174 N. E., 335.

Under the terms of the contract herein involved an effort is made to "peg" the minimum resale price of all of the manufacturer's identified or trade-marked commodities, but the act itself exempts from this restriction (1) closing out sales, (2) sales where trade-mark, brand, etc., is obliterated, (3) sales where goods are second-hand or damaged, (4) judicial sales, (5) sales to religious, charitable, and educational institutions, and (6) sales to the State of North Carolina or any of its agencies or any of the political subdivisions of the State. The plaintiff by the contract here involved undertakes to add these further exemptions: Sales to (a) physicians, (b) dentists, (c) veterinarians, or (d) hospitals. In other words, even if it is admitted that resales of manufacturers' identified commodities constitutes a class of retail sales which may be made the subject of a general law, certainly when there is exempted from this general class of retail sales ten distinct sub-classifications within the class, the law ceases to be a "general" law and becomes a "special" law which applies to some retail sales within the defined class and not to others. As such a "special" law "regulating trade" it is, in my opinion, declared void by the provisions of Art. II, sec. 29, of the N. C. Constitution.

It was the evident intent of the Legislature to make the contracts authorized by the act, when entered into, apply to all except those expressly excepted by the statute—which exceptions in themselves make the act special in nature. If, however, the act is to be given the interpre-

tation apparently placed thereon by the plaintiff and authorizes the plaintiff and others in like situation to limit those to whom the stipulated price shall apply, then the act becomes even more obnoxious. It delegates to the contracting distributor the right to make any type of classification of ultimate purchasers it may elect. If it is not to be given that interpretation then the contract relied on is not in accord with the statute and is not protected by the terms thereof, and is an unwarranted attempt to regulate prices to the ultimate consumer without statutory authority.

The act under consideration violates the provisions of N. C. Constitution, Art. I, sec. 31, relating to monopolies.

A monopoly denotes a combination, organization or entity so extensive and unified that its tendency is to suppress competition, to acquire a dominance in the market and to secure the power to control prices to the public harm with a respect to any commodities which people are under a practical compulsion to buy. It is "any combination, the *tendency* of which is to prevent competition in its broad and general sense and to control, and thus, at will, enhance prices to the detriment of the public." The common law monopolies were unlawful because of their restriction upon individual freedom of contract and their injury to the public. Contracts having a monopolistic tendency have been held to "expose the public to all the evils of monopolies," to be "to the prejudice of the public," and to be "hostile to the rights and interest of the public."

The legislation under consideration permits the creation of a monopoly as thus defined in that it opens wide the door for the creation of retailer price-fixing combinations which will inevitably destroy price competition and enhance prices to the detriment of the public. But, says the majority opinion, in effect, we are not interested in legislation which merely permits the formation of a monopoly. It is only after the monopoly has been actually formed and is operating to the detriment of the public that there is any violation of the constitutional provision. With this I cannot agree.

It may be that the term "monopoly," as used at the time of the adoption of the Constitution, was not quite so comprehensive in meaning as present-day conditions make it. Yet the term was used and the framers of the Constitution unquestionably intended to prohibit "any combination, the *tendency* of which is to prevent competition in its broad and general sense and to control, and thus, at will, enhance prices to the detriment of the public." When a statute has been enacted, the clear import of which is to authorize monopolistic combinations, the terms of Article I, section 31, of the Constitution have been violated. We are not required to stand by and await the actual formation of a monopolistic combination, and the defendant is not compelled to refrain from

action until after he has been arbitrarily forced into such unlawful enterprise before appealing to the court for relief.

Such monopolies, contracts in restraint of trade and contracts in restraint of competition (such as authorized by this statute) are unlawful at common law and are prohibited by the Constitution. Attempts to sell property for a full price and yet to place restraint upon its further alienation have been hateful to the law from Lord Coke's day to ours because obnoxious to public interest. *Strauss v. Victor Talking Machine Company*, 243 U. S. 490, 61 L. Ed. 866. Laws seeking this end are violative of the familiar rights attaching to ordinary ownership and are contrary to the public interest and to the security of trade. It is this type of law that our Constitution prohibits.

Viewing the legislation under consideration within the narrow confines of this case make it appear that only one distributor and one retailer are involved. Such is not the effect of the statute. Practically all commodities now sold on the market, from commonplace table salt to the most expensive luxury, including drugs, foods, clothing, groceries and practically every other article of merchandise, are sold under trade-mark, brand or name. Small groups of retailers, under authority of this statute, by contracting with their source of supply as to the various articles of merchandise offered to the general public may create, through the operation of the provisions of section 6 of Act, ironclad price-fixing combinations which will enhance the price and operate to the detriment of the general public, as well as to completely destroy price competition. That it has this latter effect—the destruction of price competition—is substantially admitted by the plaintiff in its allegations in the complaint that contracting retailers are threatening to breach their contracts to the end that they may meet the price competition offered by the defendant.

The majority view relies upon the absence of horizontal price maintenance, pointing out that the vertical price maintenance achieved here standing alone without horizontal price maintenance is lawful. See quotation from *Triner Corp. v. McNeil*, 363 Ill., 559, this being one of the cases which the *Old Dearborn Distributing Co. case* affirmed. In the Illinois and California Fair Trade Acts (the two acts which have been upheld by the Supreme Court of the United States—see 299 U. S., 183, and 299 U. S., 198) only *vertical* price maintenance, *i.e.,* through contracts down the line from manufacturer to wholesaler to retailer, was judicially approved as not being in conflict with the due process and the special privilege and immunities provisions of the Federal Constitution. In the instant act not only is this *vertical* price maintenance permitted, but an extensive network of *horizontal* contracts is also permitted, as the vendor may agree with the vendee that he will not sell to any other wholesaler unless that wholesaler first agrees not to resell to any whole-

LILLY & CO. *v.* SAUNDERS.

saler, retailer, or consumer who will not carry out, by further contracts or otherwise, the price maintenance plan embodied in the first contract. This system of contracts, fixing minimum prices both *vertically* and *horizontally,* is a much more elaborate and more dangerous method of price-fixing than that which has heretofore received court approval; approving a network of contracts reaching out vertically and horizontally so as to cover with a lattice-work a well-nigh perfect control of the prices of a given product moves much more definitely in the direction of approval of a monopoly than does the approval of a short chain of minimum resale price contracts. This Court might, with mild misgivings, approve such acts as the California and Illinois Fair Trade Acts, yet (by reason of Art. I, sec. 31, declaring ". . . monopolies are contrary to the genius of a free state and ought not to be allowed") strike down the so-called Fair Trade Act here under consideration. It is interesting to note in passing that, although forty-four states are reported to have adopted Fair Trade Acts (6 U. S. Law Week, 1250— 9 May, 1939), apparently only nineteen of them (Norwood, Trade Practice and Price Law, 1938, pp. 145-6) permit horizontal chains of contracts which cross and interlock with the links of the vertical chains, as allowed in the North Carolina act.

Likewise, the majority opinion is bottomed on the conclusion that the statute provides protection for the good will of the manufacturer or distributor. In this I cannot concur.

The title of the act recites that it is to "protect trade-mark owners, producers, distributors and the general public against injurious and uneconomic practices in the distribution of competitive commodities bearing a distinguishing trade-mark, brand or name, through the use of voluntary contracts establishing minimum resale prices and providing for refusal to sell unless such minimum resale prices are observed."

Thus, it indicates that the purpose of the act is to eliminate "injurious and uneconomic practices" by *voluntary* contracts, with the right in the manufacturer or distributor to refuse to sell to those who decline to contract.

The act itself authorizes contracts between manufacturers and distributors and wholesalers and retailers containing provisions cited in the statute, which provisions are violative of and radically change the common law. It then, in effect, in section 6, prohibits any noncontracting retailer from selling such commodities at less than the stipulated minimum price. This is the full scope of the act. There is nothing in respect to good will either in the caption or in the body of the act. That the act was intended to protect good will is a judicial deduction, which in my opinion is not warranted by the facts.

LILLY & CO. *v.* SAUNDERS.

Good will is that intangible asset which an individual, or corporation, dealing with the public, acquires through its reputation for fair dealing and the excellence of service or commodity offered for sale. It is the advantage accruing from the probability that the customer—induced by the quality of the merchandise sold and the courteous service rendered—will go back to trade where he has been well treated. Other and more comprehensive definitions may be found in Story, Partnership, sec. 99, 16 Am. Jur., 87; Callihan Cyc. Dict.; Words and Phrases; *Faust v. Rohr,* 166 N. C., 187; *Hilton v. Hilton,* L. R. A., 1918 F, 1174; *Bloom v. Holms Ins. Agency,* 121 S. W., 293; Bouvier's Law Dict.

While "good will" is a species of property, it evaporates and becomes nonexistent so soon as a business ceases to operate as a going concern. I have never understood that the price at which a commodity is offered for sale aided in the creation of good will, except that an excessive price will discourage and eliminate purchasers and thus decrease the value of good will, and popular prices will attract and retain satisfied customers and thus increase the value of this recognized asset.

If a manufacturer may sell its commodity to a retailer and part with title thereto for a full price and yet retain an interest therein to be protected by legislation, that right still exists after the article finally reaches the ultimate purchaser. If it exists the mere sale by the retailer could not destroy it, and to say that the manufacturer still has a property interest in the hat that I wear because it was sold under, and has printed therein, the name "Dobbs," or to conclude that the tailor possesses a property interest in my suit of clothes because there is a label attached to the inside pocket requires a process of reasoning I am unable to follow.

Even when a commodity is sold under patent or copyright—and the act under consideration does not require that the trade-mark, label or name shall be patented or copyrighted—the patentee or copyright owner parts with its statutory protection under the Federal Law. A patentee cannot by virtue of his statutory monoply impose conditions as to the resale price so as to render one who fails to observe them a contributory infringer of the patent. Cases cited in notes, 7 A. L. R., 477. After the right of the sale has been once exercised and the patentee receives his price, the article passes beyond the limits of the monoply and, in considering the validity of the contractual restraint at a price at which the article is to be resold, either at common law or under an anti-trust act, the case is to be considered as if there were no patent. Cases cited in notes 7 A. L. R., 477. The same rule applies to copyright protection; *Bobbs-Merrill Co. v. Strauss,* 210 U. S., 339, 52 L. Ed., 1086, and to trade-marked goods; *Ingersoll v. McColl,* 204 F., 147, and other cases cited in note, 7 A. L. R., 482; and to goods made by secret process;

LILLY & CO. v. SAUNDERS.

*Dr. Miles Medical Co. v. Park & Sons Co.,* 220 U. S., 373, 55 L. Ed., 502. Certainly the manufacturer or distributor has no greater right in merchandise sold under trade-mark, label or name than it would have in merchandise which was patented or copyrighted or sold under registered trade-mark.

It is true that there has been a recent change in the trend of legislation, which, due to the reluctance of the courts to invalidate legislative enactments, has brought about a shift in the line of decisions on subjects such as the one under consideration. However, this new trend tends to, and will, if followed, lead to the inevitable curtailment and eventual destruction of fundamental rights of person and property guaranteed by the Constitution. Statutes such as this give evidence of the ability of organized minorities to procure legislation for their own advantage and enrichment at the expense of the unorganized purchasing masses. They have brought about a new "orientation" from the principle of individual liberty to the idea of regimentation and strict control of commerce and property. Here a manufacturer or distributor and one retailer is granted authority to fix, by contract, the price at which a commodity shall be sold by all other retailers without regard to local conditions, overhead expenses or other circumstance. The many must yield to the will of the few to the end that the few may make a larger profit and be enriched thereby. As I have heretofore stated, such legislation, in my opinion, violates the express terms of our Constitution.

Cases cited and relied on in the majority opinion are distinguishable.

The Dearborn and other U. S. Supreme Court cases deal only with Federal questions. In *Max Factor & Co. v. Kunsman* the defendant had surreptitiously acquired the commodities of the plaintiff and was selling them at greatly reduced prices, frequently below cost. In *Mills Co. v. Swanson* language similar to the terms of section 6 of our act was not involved or discussed. Similar differences, if space would permit, could be pointed out as to the other cases cited.

If, however, the constitutionality of the act be conceded in every respect, it, in my opinion, does not apply to or authorize price-fixing contracts concerning the commodities listed in Class II. It is expressly stipulated that: "Products falling within this class are those which are marketed exclusively by the plaintiff under patent owned or controlled by the plaintiff or under which plaintiff has been granted an exclusive license. The statute authorizes contracts in respect to a commodity which is "in free and open competition with commodities of the same general class produced or distributed by others." Products in Class II are not sold in competition with such designated commodities. To hold that they fall within the provisions of the statute is to say that the exclusive manufacturer of a product may fix the retail sale price thereof

upon the theory that when sold by one retailer, it is in competition with the same product sold by another retailer. This does not seem to me to be within the intent or purpose of the statute.

For the reasons stated, I am of the opinion that the judgment below should be affirmed.