## HUTZLER BROS. CO. *v.* REMINGTON PUTNAM BOOK CO.

[No. 100, October Term, 1945.]

*Decided March 15, 1946.*

The cause was argued before MARBURY, C. J., DELAPLAINE, COLLINS, GRASON, and HENDERSON, JJ.

*S. Ralph Warnken,* with whom were *Cook, Warnken, Veazey & Markell* on the brief, for the appellant.

*Michael F. Delea* for the appellee.

DELAPLAINE, J., delivered the opinion of the Court.

This is the second suit brought by Remington Putnam Book Company, retail bookseller, of Baltimore, to enjoin violation of a resale price agreement under the Maryland Fair Trade Act. Acts of 1937, Chap. 239; Code, 1939, Art. 83, Secs. 102-110.

The first suit was brought in 1940 against R. Lyle Schill, trading as Schill's Book Shop, to enjoin violation of an agreement with Simon & Schuster. In that case the Court of Appeals in 1941 affirmed an order overruling Schill's demurrer to the bill of complaint. *Schill v. Remington Putnam Book Co.,* 179 Md. 83, 17 A. 2d 175. Schill was given permission to amend his answer, but the chancellor subsequently sustained a demurrer to his an-

swer and granted an injunction against him. On April 8, 1943, we reversed the chancellor's decree and dismissed the bill of complaint on the ground that the answer contained an allegation that the agreement was entered into in restraint of interstate commerce in furtherance of a conspiracy between publishers and booksellers to fix prices. *Schill v. Remington Putnam Book Co.*, 182 Md. 153, 31 A. 2d 467, 32 A. 2d 296. We recognize that, while the Sherman Anti-Trust Act was amended in 1937 by the Miller-Tydings Act, 15 U. S. C. A., Sec. 1, to permit contracts prescribing minimum prices for the resale of a commodity which bears the trade-mark, brand, or name of the producer or distributor in states where such contracts are legal by statute so far as intrastate transactions are concerned, yet a producer of such a commodity cannot limit by contract the price at which, or the persons to whom, its purchaser may resell, except in so far as he moves along the route marked by the Miller-Tydings Act. *United States v. Univis Lens Co.*, 316 U. S. 241, 62 S. Ct. 1088, 86 L. Ed. 1408; *United States v. Bausch & Lomb Optical Co.*, 321 U. S. 707, 64 S. Ct. 805, 88 L. Ed. 1024. During the period from 1940 to 1943, when suit was pending, Schill maintained the prices fixed by Simon and Schuster, but continued to cut the prices of other publishers.

On June 23, 1944, Remington Putnam entered into an agreement with Harper & Brothers, of New York, and on July 12 the book department of Hutzler Brothers Company received a notice from Harper that the resale price of "The Time for Decision" by Sumner Welles would be $3 in all book stores and departments stores in every state having a Fair Trade Law. On the same day Hutzler replied as follows: "As you doubtless know, since the final decision of the Court of Appeals in the case of Remington Putnam Book Co. v. Schill, certain Baltimore stores have ignored the fair trade prices on your publications and have made and advertised sales at 15% below the list prices. In the current telephone directory both Schill's and Avon Book Shop have such advertisements.

We are compelled to meet this price competition. Since in the Schill case your fair trade agreement has been held to be unlawful and unenforceable, it is no more enforceable against us than against Schill. Indeed, the very fact that the agreement cannot be enforced against Schill necessarily terminates the agreement so far as we are concerned." Accordingly on August 3 Remington Putnam brought the instant suit in the Circuit Court of Baltimore City. The chancellor granted a temporary injunction. Defendant filed a demurrer and answer, and the demurrer was overruled. On January 30, 1945, the Court of Appeals affirmed the orders of the chancellor and remanded the case for further proceedings. *Hutzler Brothers Co. v. Remington Putnam Book Co.,* 184 Md. 327, 40 A. 2d 823.

At the trial of the case, Louis S. Hutzler, vice-president of defendant, declared that he would prefer to sell at prices fixed by the publishers, but the policy of his company has always been to keep any other store from underselling it. He further said that, after waiting more than a year after the decision in the Schill case, he presumed that Remington Putnam did not intend to take any further legal action to stop price cutting, and accordingly determined to meet Schill's competition. It is clear that defendant deliberately violated the contract between complainant and Harper. It knew that the contract existed, and nevertheless sold books included therein at less than the stipulated prices. This court held in 1939 that the Fair Trade Act is constitutional and enforceable. *Goldsmith v. Mead Johnson & Co.,* 176 Md. 682, 7 A. 2d 176, 125 A. L. R. 1339. Section 107 of the Act expressly provides that any person who wilfully and knowingly advertises, offers for sale or sells any commodity at less than the price stipulated in a contract entered into pursuant to the Act is engaged in unfair competition, whether or not such person is a party to the contract. However, when a dealer is not a party to a contract under the Act, his interests are not affected by it until he elects to be bound by the contract by virtue

of the Act by voluntarily deciding to buy and sell the commodity on which the minimum price is fixed. The law is also established that copyrighted books distributed by publishers are "commodities" within the contemplation of the Fair Trade Act when in free and open competition with commodities of the same general class produced or distributed by others. *Schill v. Remington Putnam Book Co.*, 179 Md. 83, 17 A. 2d 175, 181, 22 A. 2d. 128. On this appeal from a decree enjoining defendant from advertising, offering for sale or selling any books published by Harper at less than prices fixed by the agreement, the contention is that, since complainant was not able to prevent Schill from price cutting, defendant is justified in meeting his competition.

The very description of the statute as a "Fair Trade Act" carries with it the fundamental equitable concept that "he who seeks equity must do equity." When any producer or retailer seeks the benefit of the Act, he should be given relief in equity only in case he has acted fairly toward all others affected by the contract. The Act requires by implication that the prices fixed in the contract shall be uniform in any competitive area. In the performance of the agreement, the producer must refrain from causing any unjust discrimination among the retail dealers, if he wants to enjoy the benefits of the Act. In addition, the producer is required to use reasonable diligence to see that his products are not sold to a retailer who cuts prices after the producer has notice of such violation, and may be required to resort to legal action if necessary. Especially where the price cutting has been general and long continued, the failure of a producer to take effective measures to prevent such violation should be regarded as a waiver or abandonment of the rights conferred by the contract; otherwise, unjust discrimination, instead of fair trade, would be the product of the statute. Hence, a court of equity will deny the producer injunctive relief against the violation of his resale price restrictions if it is shown that he waived his right to insist upon the maintenance of the resale price

by permitting or tolerating the practice of price cutting by one or more of the retailers.

However, the right of a producer or retail dealer to an injunction against a violator of a fair trade agreement is not defeated by the fact that there may be some violators of the agreement who have not been sued. In the first place, there is no mandatory provision in the Fair Trade Act requiring a producer or retail dealer to take legal action to protect the price levels; the Act simply gives such person the right to take such action if he chooses. Secondly, it would often be impossible to enforce one's rights under a fair trade agreement if, as a prerequisite to relief, it were necessary to institute suit to enjoin all violators simultaneously, or show that the complainant has forced all other dealers to comply with the agreement. We hold that a retailer of a copyrighted book cannot take advantage of an alleged breach of a fair trade agreement by others as a defense to a suit against him, unless the violations indicate improper discrimination or unfair business practices, or an acquiesence in the unlawful cutting of prices, or a waiver or abandonment of rights acquired under the statute. In bringing a suit for injunction against a violator of such an agreement, it is sufficient if the complainant has exercised reasonable diligence to prevent price cutting by other violators. *National Distillers Products Corporation v. Columbus Circle Liquor Stores*, 2 N. Y. S. 2d 319; *Calvert Distillers Corporation v. Nussbaum Liquor Store*, 2 N. Y. S. 2d 320; *Lentheric, Inc. v. Weissbard*, 122 N. J. Eq. 573, 195 A. 818; *Automotive Electric Service Corporation v. Times Square Stores Corporation*, 24 N. Y. S. 2d 733; *Calvert Distilling Co. v. Gold's Drug Stores*, 123 N. J. Eq. 458, 198 A. 536; *Ely Lilly & Co. v. Saunders*, 216 N. C. 163, 4 S. E. 2d 528, 125 A. L. R. 1308, 1359-1362.

It was urged that complainant had notified Harper in February, 1944, five months before the sale of the book by Mr. Welles, that Schill was advertising "A Tree Grows in Brooklyn," a novel by Betty Smith, for $2.34, and

predicted that he would stir up "the old hornet's nest." Schill admitted that he had been selling many new books, including Harper's, at below the list prices, but he swore that he had received very few notices from the publishers and consequently did not know whether Harper's books were price protected. However, in our opinion, the evidence fails to show that there was a waiver or an abandonment by Harper of its rights under the Fair Trade Act. Replying to the letter from Hutzler in July, 1944, Harper asserted surprise at the outcome of the Schill case, expressed its opinion that the Fair Trade Law is "a distinct step forward," and urged the book departmen to withdraw its announcement and restore the books to their proper prices. It is evident that Harper, with publishing houses in New York City and London and retail dealers in cities over a wide area, was relying upon Remington Putnam to take such action at law as it deemed appropriate against violators of its fair trade agreements in Baltimore. So, it was not until 1944 that Harper received the news of the unfavorable decision in the suit against Schill on the agreement with Simon & Schuster.

Nor can we say from the evidence in this case that Remington Putnam has not exercised reasonable diligence to prevent price cutting by violators other than defendant. This bookseller has signed many price maintenance agreements since the enactment of the Maryland Fair Trade Act in 1937. Its advocacy of price maintenance was voiced by William H. George, its treasurer, who asserted that, while the gross income from sales of books amounts to about $400,000 annually, the net profit therefrom is only about 4½ per cent., so that a 25 per cent cut in the price of books would lead to bankruptcy. When he was asked why his company had not sued Schill, he replied that it had, and the case was contested from 1940 to 1943, and while he felt that the company could not afford another suit like it, yet with Schill's discount of 15 per cent. making "a perfect dent" in the business, and Hutzler's discount of 25 per cent. nearly ruinous,

it was decided to proceed against Hutzler as a last resort. It is our opinion that, while complainant has not succeeded in getting full compliance with its fair trade agreements, it has made diligent efforts to secure compliance, and therefore was entitled to the injunction.

*Decree affirmed, with costs.*