EASTMAN KODAK COMPANY, a body corporate, Appellant and Cross-Appellee,

v.

HOME UTILITIES COMPANY, Incorporated, a body corporate, Appellee and Cross-Appellant.

No. 7172.

United States Court of Appeals Fourth Circuit.

Argued April 26, 1956.

Decided June 5, 1956.

David R. Owen, Baltimore, Md. (Semmes, Bowen & Semmes, Baltimore, Md., on brief), for appellant and cross-appellee.

Harry Silbert and Melvin J. Sykes, Baltimore, Md., for appellee and cross-appellant.

Before PARKER, Chief Judge, and SOPER and DOBIE, Circuit Judges.

DOBIE, Circuit Judge.

Eastman Kodak Company (hereinafter called Eastman) brought, in the United States District Court for the District of Maryland, a civil action against Home Utilities Company, Incorporated (hereinafter called Home Utilities) seeking an injunction to prevent Home Utilities from selling Eastman products at less than the "Fair-Trade" prices, under the Maryland Fair Trade Act, Laws of 1937, Chapter 239; Maryland Code, 1951, Article 83, §§ 102–110.

The District Judge granted a permanent injunction against such price-cutting by Home Utilities in the sale of Eastman cameras, film, lenses, projectors and viewers. However, he excluded so-called camera "Outfits" on the ground that they contain certain items not of Eastman manufacture as well as other items manufactured by Eastman but not Fair-Traded when sold separately. Eastman has appealed from that portion of the Decree. Home Utilities has filed a cross-appeal.

We set out Sections 102–110 of the Maryland Fair Trade Act:

"102. The following terms, as used in Sections 102–110, are hereby defined as follows:

"(A) 'Commodity' means any subject of commerce.

"(B) 'Producer' means any grower, baker, maker, manufacturer, bottler, packer, converter, processor or publisher.

"(C) 'Wholesaler' means any person selling a commodity other than a producer or retailer.

"(D) 'Retailer' means any person selling a commodity to consumers for use.

"(E) 'Person' means an individual, a corporation, a partnership, an association, a joint-stock company, a business trust or any unincorporated organization.

"103. No contract relating to the sale or resale of a commodity which bears, or the label or container of which bears, or the vending equipment from which a commodity is sold to consumer bears, the trademark, brand, or name of the producer or distributor of such commodity and which commodity is in free and open competition with commodities of the same general class produced or distributed by others shall be deemed in violation of any law of the State of Maryland by reason of any of the following provisions which may be contained in such contract:

"(A) That the buyer will not resell such commodity at less than the minimum price stipulated by the seller.

"(B) That the buyer will require of any dealer to whom he may resell such commodity an agreement that he will not, in turn, resell at less than the minimum price stipulated by the seller.

"(C) That the seller will not sell such commodity:

"(1) to any wholesaler, unless such wholesaler will agree not to resell the same to any retailer unless the retailer will in turn agree not to resell the same except to consumers for use and at not less than the stipulated minimum price, and such wholesaler will likewise agree not to resell the same to any other wholesaler unless such other wholesaler will make the same agreement with any wholesaler or retailer to whom he may resell; or

"(2) to any retailer, unless the retailer will agree not to resell the same except to consumers for use at not less than the stipulated minimum price.

"104. For the purpose of preventing evasion of the resale price restrictions imposed in respect of any commodity by any contract entered into pursuant to the provisions of Sections 102–110, (except to the extent authorized by the said contract):

"(a) The offering or giving of any article of value in connection with the sale of such commodity;

"(b) The offering or the making of any concession of any kind whatsoever (whether by the giving of coupons or otherwise) in connection with any such sale; or

"(c) The sale or offering for sale of such commodity in combination with any other commodity, shall be deemed a violation of such resale price restriction, for which the remedies prescribed by Section 107 of this sub-title shall be available.

"105. No minimum resale price shall be established for any commodity, under any contract entered into pursuant to the provisions of Sections 102–110, by any person other than the owner of the trade-mark, brand or name used in connection with such commodity or a distributor specifically authorized to establish said price by the owner of such trade-mark, brand or name.

"106. No contract conta ning any of the provisions enumerated in Section 103 of this sub-title shall be deemed to preclude the resale of any commodity covered thereby without reference to such contract in the following cases:

"(A) In closing out the owner's stock for the *bona fide* purpose of discontinuing dealing in any such commodity and plain notice of the fact is given to the public; provided the owner of such stock shall give to the producer or distributor of such commodity prompt and reasonable notice in writing of his intention to close out said stock, and an opportunity to purchase such stock at the original invoice price;

"(B) When the goods are altered, second-hand, damaged, defaced or deteriorated and plain notice of the fact is given to the public in an ad-

vertisement and sale thereof, such notice to be conspicuously displayed in all advertisements and to be affixed to the commodity;

"(C) By any officer acting under an order of court.

"107. Wilfully and knowingly advertising, offering for sale or selling any commodity at less than the price stipulated in any contract entered into pursuant to the provisions of Sections 102–110, whether the person so advertising, offering for sale or selling is or is not a party to such contract, is unfair competition and is actionable at the suit of any person damaged thereby.

"108. Sections 102–110 shall not apply to any contract or agreement between or among producers or distributors or, except as provided in subdivision (C) of Section 103 of this sub-title between or among wholesalers, or between or among retailers, as to sale or resale prices.

"109. If any provision of Sections 102–110, or the application thereof to any person or circumstances, is held invalid, the remainder of said sections, and the application of such provisions to other persons or circumstances, shall not be affected thereby.

"110. Sections 102–110 may be known and cited as the 'Fair Trade Act.' "

The federal McGuire Act, Act of July 14, 1952, c. 745, § 2; 66 Stat. 632, 15 U.S.C.A. § 45(a), reads:

"(a) (1) Unfair methods of competition in commerce, and unfair or deceptive acts or practices in commerce, are declared unlawful.

"(2) Nothing contained in this section or in any of the Antitrust Acts shall render unlawful any contracts or agreements prescribing minimum or stipulated prices, or requiring a vendee to enter into contracts or agreements prescribing minimum or stipulated prices, for the resale of a commodity which bears, or the label or container of which bears, the trade-mark, brand, or name of the producer or distributor of such commodity and which is in free and open competition with commodities of the same general class produced or distributed by others, when contracts or agreements of that description are lawful as applied to intrastate transactions under any statute, law, or public policy now or hereafter in effect in any State, Territory, or the District of Columbia in which such resale is to be made, or to which the commodity is to be transported for such resale.

"(3) Nothing contained in this section or in any of the Antitrust Acts shall render unlawful the exercise or the enforcement of any right or right of action created by any statute, law, or public policy now or hereafter in effect in any State, Territory, or the District of Columbia, which in substance provides that willfully and knowingly advertising, offering for sale, or selling any commodity at less than the price or prices prescribed in such contracts or agreements whether the person so advertising, offering for sale, or selling is or is not a party to such a contract or agreement, is unfair competition and is actionable at the suit of any person damaged thereby.

"(4) Neither the making of contracts or agreements as described in paragraph (2) of this subsection, nor the exercise or enforcement of any right of action as described in paragraph (3) of this subsection shall constitute an unlawful burden or restraint upon, or interference with, commerce.

"(5) Nothing contained in paragraph (2) of this subsection shall make lawful contracts or agreements providing for the establishment or maintenance of minimum or stipulated resale prices on any commodity referred to in paragraph (2) of this subsection, between manufacturers,

or between producers, or between wholesalers, or between brokers, or between factors, or between retailers, or between persons, firms, or corporations in competition with each other.

"(6) * * *."

We take up first the questions raised by the cross-appeal of Home Utilities. Both the Maryland Fair Trade Act and the McGuire Act contain two safeguards to protect consumers as to Fair Trade products: (1) Fair Trade can be applied only to goods in free and open competition with others of the same general class. In other words, a producer who has a monopoly of all goods of a general class cannot Fair Trade any of them. (2) Even if a producer does not have a monopoly, he still cannot establish Fair Trade prices by agreement with other producers. There is no suggestion in this case that Eastman has violated "Safeguard No. 2". The contention that it has violated "Safeguard No. 1" is, we think, without merit.

The evidence in this case shows that Eastman does not have a monopoly of black and white film, still cameras, movie cameras, camera outfits, camera lenses, slide projectors or viewers, all of which are Fair Traded. Both Mr. McBride of Eastman's Sales Department, and Mr. Settler, an independent dealer, testified that Eastman's products do compete with those of the other manufacturers.

The extent of the choice available to a customer interested in a particular photographic item is graphically illustrated by the "Master Buying Guide and Directory Issue" published by Photographic Trade News, Inc. This is a 522 page catalogue of the products of all photographic manufacturers. Mr. Simmons, Eastman's salesman for the Maryland area, used this publication to show the large number of competitive products available to the customer. Even Mr. Helman, President of Home Utilities, freely admitted that every one of Eastman's Fair Traded products "has a counterpart in some other manufacturer."

Home Utilities contends that lack of competition is shown in the field of photographic goods by the fact that when one manufacturer cuts prices, other manufacturers do likewise. This is a clear *non-sequitur*. See Ely Lilly & Co. v. Saunders, 216 N.C. 163, 4 S.E.2d 528, 125 A.L.R. 1308. As was said in the Report of the Attorney General's National Committee to Study the Antitrust Laws (1955, at page 332): "Effective competition is therefore compatible with meeting (or matching) the prices of rivals, or with undercutting them." Even Helman testified:

"A. I would say that these companies are within range of each other on these different types of cameras that are the reflex type, or the direct sight type—that the prices do not vary very much between the different companies.

"(The Court): When a change occurs in one, does a relatively similar change occur in the others? A. Usually the company announces a change in price to make it competitive."

Nor is price the sole factor in competition in the photographic industry. Quality, appearance, effectiveness, service and many other factors figure in the competitive picture.

The race between Eastman and its competitors for the consumer's dollars was well summarized by Mr. Simmons in answer to questions by the District Judge. Simmons testified that Eastman will and does change prices, appearance, and mechanical features in order to "try to keep ahead of the competition." And then "the others try to catch up." The record clearly disclosed that the Eastman Fair Trade products here involved faced free and open competition. We, therefore, must uphold the finding of the District Judge: "the Eastman fair-traded products are, within the meaning of the term as employed in the Maryland

Fair Trade Act, in free and open competition with products of the same general class."

■ The chief defense set up by Home Utilities in the District Court seems to have been that Eastman has waived its right to enforce Fair Trade practices against Home Utilities by virtue of the fact that Eastman has failed to exercise reasonable diligence to prevent violations of the Maryland Fair Trade Act by retailers of Eastman products. See, Hutzler Brothers Co. v. Remington-Putnam Book Co., 186 Md. 210, 46 A.2d 101, 163 A.L.R. 884. And see, particularly, the case, decided by our court, of Home Utilities Co. v. General Electric Co., 4 Cir., 227 F.2d 384, affirming D.C., 131 F.Supp. 838.

This feature of the case was covered at length in the opinion of the District Judge in this case. He found: "This record certainly does not evidence a waiver by permitting or tolerating the practice of price cutting * * *. On the contrary, it shows a reasonable diligence and satisfactory results. * * * The court therefore concludes that Home Utilities has failed to establish by the weight of the credible evidence that Eastman has not exercised reasonable diligence to prevent price cutting in the Baltimore area." We uphold these findings.

This brings us to the appeal of Eastman, which presents a single question of no little difficulty and of great practical importance: Can Eastman Fair-Trade its "Outfits," which consist of all items necessary for the taking of flash pictures, viz., a Fair-Traded Eastman camera, Fair-Traded Eastman film, a non-Fair-Traded Eastman flash-holder, a non-Fair-Traded Eastman flash guard, an Eastman instruction book, flash bulbs and batteries manufactured by companies other than Eastman, and a carrying case, all packaged in a single box which bears the characteristic Eastman yellow, black and red colors, the Eastman Kodak Company name and the trade mark Kodak and others? The District Judge answered this question in the negative. We think the question should have been answered in the affirmative.

These "Outfits" have been sold in large quantities. Everything is in one unit. All of the component parts are put together, and all the buyer has to do is to take the film out of the box, load the camera, take the batteries out of the carton and put them into the unit, and the buyer can open the carton and take a picture within a few minutes. It gives the customer an opportunity to buy the complete outfit without finding it short of items that he would need to take pictures, because somebody failed to list any of the parts that go with an outfit. Retailers also reap a benefit from selling "Outfits" instead of the component parts separately in that it saves time for the sales clerk and prevents any error on his part in selling the wrong bulb, battery, or flash holder, or in forgetting one or more of these items completely.

Eastman now produces fourteen different "Outfits," all of which are separately listed in its Fair Trade price list. Eastman purchases bulbs from several manufacturers, General Electric, Westinghouse and Sylvania. Batteries are purchased from Bright Star, Olin and Burgess. Eastman includes in its "Outfits", as they come off the assembly line, those bulbs and batteries which happen to be available. Neither the carrying case, nor the shipping container, nor the shipping document indicates the identity of the bulbs or batteries which are included in any particular shipment. Even though retailers may also handle a certain make of bulb or battery, the evidence shows that they pay no attention to the make of bulb or batteries included in the Kodak "Outfits" which they receive. This is true of Home Utilities. The testimony of experienced retailers in this field also revealed that the customer shows no interest in the make of bulb or battery included in the "Outfit," although the same individual may specify a particular brand when ordering bulbs separately.

The "Outfit" is a functional unit containing everything necessary for the taking of flash pictures. It is packaged, priced, advertised and sold as such. Each of Eastman's "Outfits" commands a price which is greater than the total prices of the component parts when sold separately. The uncontradicted testimony in this case is that, despite the inclusion of flash bulbs and batteries manufactured by other companies, the Kodak "Outfit" is a Kodak product, sold under the Eastman name and Kodak trade-mark, so that the buyer looks to Eastman as a guarantor of the excellence and fitness of everything included in the "Outfit." The Fair Trading of these "Outfits" is not new. Eastman, Ansco and Argus have all Fair Traded these "Outfits."

██ Both the McGuire Act and the Maryland Statute authorize Fair Trade contracts with respect to the sale of a "commodity." Section 102(A) of the Maryland Act, Article 83, defines this very broadly to mean "any subject of commerce." In Schill v. Remington Putnam Book Co., 179 Md. 83, 17 A.2d 175, 22 A.2d 128, the Maryland Court of Appeals indicated that the statutory word "commodity" must be given a very liberal interpretation. In that case it was held that a copyrighted book was a "commodity" subject to Fair Trade. The Court said, 179 Md. at page 87, 17 A.2d at page 177:

"The act defines 'commodity' as 'any subject of commerce'; and while the word 'commerce' in itself is a broad term, its ordinary meaning, as applied to trade, is the exchange of goods or property of any kind for money, or for other goods or property. Under such definition there can be no doubt that a book, as physical property, is an article adapted to commerce."

Clearly an "Outfit" is "physical property" which is a "subject of commerce" because it is regularly exchanged for money in the market place. It, therefore, we think, complies with the statutory requirement as construed by the Maryland Court of Appeals.

The record here quite conclusively shows that these "Outfits" are regarded as separate commodities by manufacturers, retailers and buyers. Thus, witness Shepard testified: "The net result is a separate item, backed by the Kodak name shown clearly on the package." In like manner, witness Cohen stated: "Kodak advertises the outfit, and that is what people want to buy. * * * The package * * * is bought by the customer as a separate commodity, rather than Read's Kodak camera plus accessories." And witness Settler said:

"The advantage is that the outfit is pre-sold. By that I mean that *it has been advertised, and the trade name is put on it*. I mean it is pre-sold. The retail clerk does not have to spend too much time on selling the item in the store, because a customer may come in and know what he wants and ask for that particular outfit." (Italics ours.)

The evidence in this case shows that the brand names of the bulbs and batteries are of no significance whatever in the sale of Eastman's "Outfits." It is the Kodak name and trade mark which actually sells the "Outfit." So long as these appear on the "Outfit," it is immaterial that the bulbs and batteries do not individually carry the Kodak name. The source of these small items is immaterial to the merchandiser and to the consumer. It is the "Outfit" as such which is being sold.

Retailers likewise have no interest in the kind of bulbs and batteries provided with the Eastman "Outfits." Settler testified that as a wholesaler he had never had a request from any retailer to furnish "Outfits" with any particular type of bulb or battery: "They ask us for the Kodak or the Ansco Outfits, or the Argus Outfit, but not particularly as to the type of flashlight or battery." Home Utilities purchases its Eastman products from Settler. This shows that Home Utilities, like other retailers, sells Eastman's "Outfits" as separate commodities and has no merchandising interest in the component parts as such.

According to the testimony of Eastman's witness Shepard:

"By putting it into this box and making it a unit in and of itself, with a little strap on it to keep it together and to carry it around, he gets everything in a convenient package, again backed up by Kodak, in this case a Kodak Duaflex IV. It has our trade-mark 'Kodak' on it, it has our trade-mark 'Duaflex' on it, and 'Made by Eastman Kodak Company, Rochester, New York', which, to our way of thinking, carries considerable weight as to that particular outfit, and convenience with it, in that he gets it all in one place."

The camera, of course, is the dominant feature of the "Outfit."

We think the District Court here was influenced more by what might have happened than by what has happened—by imaginary facts rather than by actual facts. Thus the District Judge evidently felt that an "Outfit" could not be Fair Traded because the retailer might break it up and sell the parts separately. The evidence, however, is that this is actually never done. Similarly the District Judge brought out through one retailer that he would be willing to substitute one type of bulb for another in an "Outfit" if a customer should request it. The witness, however, made it plain that no customer had ever made such a request, or indeed shown the slightest interest in the identity of the bulbs or batteries contained in "Outfits." Regardless of what might be done, the record in this case shows that what actually is done by the manufacturer, the wholesaler, the retailer, and the customer is to treat the "Outfit" as a separate article of commerce without regard to the identity of the eight bulbs and two batteries contained therein. Nor do we think, under these circumstances, the District Judge was correct in characterizing the "Outfit" as "a mere aggregation of components."

■ It seems that Home Utilities has never seriously denied that Eastman's Fair Trade contracts are broad enough to include these "Outfits." The United States Supreme Court has definitely decided that the Fair Trade Statutes permit Fair Trading by one company of articles purchased from another company. Soft-Lite Lens Co. v. United States, 321 U.S. 707, 64 S.Ct. 805, 88 L. Ed. 1024; Old Dearborn Distributing Co. v. Seagram-Distillers Corporation, 299 U.S. 183, 57 S.Ct. 139, 81 L.Ed. 109.

■ It does not seem essential for us to decide whether the relation of Eastman to these "Outfits" be characterized as "manufacturer," "producer" or "distributor." By putting its name and trade-mark on the carrying case of its "Outfits," Eastman has legally, as well as practically, insured that the public will rely upon its name in purchasing the "Outfits," regardless of the sources of the component parts. Since it is the Kodak trade-mark which both sells and guarantees the "Outfit," Eastman should be able to Fair Trade these "Outfits" and to enjoin unfair competition which is damaging the good will represented by the mark and by the name. Said Chief Justice Fuller, in Menendez v. Holt, 128 U.S. 514, 520, 9 S.Ct. 143, 144, 32 L.Ed. 526:

"The brand did not indicate by whom the flour was manufactured, but it did indicate the origin of its selection and classification. It was equivalent to the signature of Holt & Co. to a certificate that the flour was the genuine article which had been determined by them to possess a certain degree of excellence."

See, also, Ralston Purina Co. v. Saniwax Paper Co., D.C., 26 F.2d 941, 943–944.

■ The fact that Eastman does not Fair Trade some of the articles included in the "Outfit," when these articles are sold separately, does not prevent Eastman from Fair Trading these "Outfits," when sold as "Outfits". There is nothing in the Maryland Fair Trade Act which prevents one from Fair Trading some of its products and not Fair Trading other of its products. Fair Trading is not an all or nothing proposi-

tion. See, Columbia Records, Inc. v. Goody, 278 App.Div. 401, 105 N.Y.S.2d 659; General Electric Co. v. S. Klein-on-the-Square, Inc., Sup., 121 N.Y.S.2d 37.

The District Judge, in his opinion in this case, and counsel for Home Utilities, lay great stress on the case of Eastman Kodak Co. v. Siegel, which in various phases came in the New York Supreme Court before Justice Levy, Justice Steuer and Justice Saypol. Certainly that case favors the contention of Home Utilities that these Eastman "Outfits" cannot be Fair Traded. (Levy) 207 Misc. 283, 136 N.Y.S.2d 800;[1] (Steuer) 207 Misc. 986, 140 N.Y.S.2d 260; (Saypol) (1956).

Said Justice Levy in the Siegel case:

"It would frustrate that intent where protection of the statute afforded a manufacturer of a product (trade-marked and fair-traded by him) who grouped with that article other items (branded but not fair-traded by him) and then labelled the assembled package with the trademark in question." 207 Misc. at page 288, 136 N.Y.S.2d at page 804.

Justice Steuer approved Justice Levy's decision and characterized Justice Levy as holding "a manufacturer may only fair trade products of his own manufacture." 140 N.Y.S.2d at page 261. Justice Saypol decided [150 N.Y.S.2d 112]:

"I conclude that on the particular facts in this case wherein the combination package consists of some different trademarked products of the same manufacturer, not all of which are fair traded when sold separately * * * the manufacturer may not, as regards the package have the protection afforded by the Fair Trade Law."

In a case note in Harvard Law Review (69 Harv.L.Rev. 385), it is stated, at page 386:

"Since plaintiff failed to set a minimum price for its flash holders when sold separately, the court's refusal to enforce a fair trade price for a package containing the flash holder appears sound. * * * However, the same objection (as to the flash holder) would not seem to apply to items which are not sold independently of the package, or which, like the flash-bulbs and batteries in the instant case, are sold independently under a brand name different from that appearing on the package. There would seem to be no valid objection to enforcement of fair-trade prices on products such as radios and television sets, even though their parts, bearing the names of manufacturers other than the one whose brand identifies the product as a whole, are sold separately free of any minimum price restrictions. Although the brand names on the items in plaintiff's outfit do not lose their individual identity to the extent that radio and televison parts do, the names lose virtually all marketing significance when comparatively inexpensive and sold as part of the package, since the outfit as a whole is advertised and sold as an Eastman Kodak product."

Cf. United States v. Univis Lens Co., 316 U.S. 241, 62 S.Ct. 1088, 86 L.Ed. 1408; Mallinson Fabrics Corporation v. R. H. Macy & Co., 171 Misc. 875, 14 N.Y.S.2d 203; Krupsaw v. Luskin (Oppenheimer, J., Circuit Court of Baltimore City), 1956 C.C.H. Trade Cases, par. 68,288.

To summarize, we think that the Eastman "Outfits" here involved were commodities, that they were in free and open competition, that they possessed a functional unity apart from their component parts, that they were sold under the Eastman name and the Kodak trademark to buyers who relied on that name

1. Since this opinion was prepared, the Appellate Division of the Supreme Court of New York, First Department, on May 22, 1956, 151 N.Y.S.2d 859, reversed the decision cited insofar as it holds that Eastman combination packages cannot be fair-traded. See Eastman Kodak Co. v. Siegel, 150 N.Y.S.2d 99.

and trade-mark, and that, consequently, these "Outfits" could be Fair Traded by Eastman under the McGuire Act and the Maryland Fair Trade Act.

The judgment of the District Court is affirmed in so far as it granted an injunction to Eastman against Home Utilities, but is reversed in so far as it denied an injunction to Eastman covering these "Outfits," and the case is remanded to the District Court with instructions to extend the injunction so as to cover the sale by Home Utilities of the Eastman "Outfits."

Affirmed in part, modified in part and remanded.