**SONY CORPORATION OF AMERICA,**
Plaintiff,

v.

**BEST PRODUCTS COMPANY, INC.,**
Defendant.

Civ. No. 72–696.

United States District Court,
D. Maryland.

Dec. 22, 1972.

George R. Kucik, Washington, D. C., for plaintiff.

David Albright, Baltimore, Md., James L. Sanderlin, Richmond, Va., for defendant.

## MEMORANDUM OPINION AND ORDER

JOSEPH H. YOUNG, District Judge.

Sony Corporation of America (Sony), a New York corporation with its principal place of business in New York, seeks injunctive relief and damages from Best Products Company, Inc. (Best), a Virginia corporation with its principal place of business in Virginia, alleging willful violation of fair trade agreements executed pursuant to the Maryland Fair Trade Law, Maryland Annotated Code, Article 83, §§ 102–110 (1969). Following an evidentiary hearing held on December 4–8, 1972, and upon the entire record, the Court makes the following:

## FINDINGS OF FACT

1. Sony Corporation, a Japanese corporation, is the owner of a valuable trademark, identifying products in the electronics field. Sony-Japan, through Sony, a subsidiary, advertises its trademark as an integral part of its national marketing program. (Plaintiff's exhibit —PX 19–24).

2. Sony, duly authorized by its parent, executed in April, 1972, fair trade contracts with various retailers, specifying minimum prices for numerous designated products bearing the Sony trademark. (PX 4–7).

3. The product list contained therein was revised and amended as designated on the July, 1, 1972, Minimum Price Schedule and a Notice of Amendment dated August 28, 1972. (PX 9–10).

4. Following the execution of the contracts, notice of the execution and instructions concerning the establishment

of the fair trade program were mailed in early May to all known Sony dealers in the State of Maryland, return receipt requested, in accordance with the list of dealers on PX 18.

5. Sony also instructed distributors to notify their Sony accounts of the fair trade program. (PX 13–15)

6. Since Sony had not dealt directly with Best, Best was not included in the initial list of known Sony dealers. Upon learning of Best's dealings in Sony products in Maryland, Sony informed Best of its program in a letter dated May 11, 1972, followed by a warning letter based on Sony's information that Best was violating the fair trade program. (PX 25)

7. Best has consistently offered for sale and sold fair traded Sony products at below fair trade prices at its Rockville and Baltimore stores. See data supplied by Best on its pricing history (defendant's exhibits (DX) 201–236) and shopping reports prepared by Merit Protective Service, Inc. (PX 26–33).

8. The products currently sold at below the fair trade prices are those identified in PX 413, excerpts from defendants' answers to interrogatories Nos. 10, 11, 12, 14, 15, 16 and certain items in DX 201–36, which also appears in the fair trade schedule (PX 25, 9, 10).

9. Sony, with the assistance of counsel, undertook the enforcement of its fair trade program. Following notification to all Sony dealers, directly or through distributors (Findings 4, 5), it employed Merit Protective Service, Inc. and Pinkerton's, Inc. to conduct professional shoppings of known dealers and to seek out other dealers. Raymond Steiner, a vice president of Sony, signed warning letters addressed to those dealers revealed to be in violation by the shopping reports. The testimony of Steiner, Alan Malasky and of various Merit and Pinkerton investigators is supplemented by the shopping reports and warning letters in PX 26–406.

10. Despite some minor flaws in the shopping reports, it was demonstrated that well over 150 separate stores complied with the program. Of approximately 30–35 stores found in violation (see DX 279–374), ten, in addition to Best, have already been sued. As to those not sued, with one exception, Sony has secured compliance or plans imminent enforcement action.

11. Sony faces competition in the electronics field from many quarters— Zenith, Philco, Admiral, Sylvania and Packard Bell, to name a few. There is no evidence that Sony has made any agreements with competitors concerning prices, or possesses an overwhelming share of the television, radio or stereo equipment markets.

12. The weight of the evidence is that prior to fair trade Sony has not refused to deal with Best directly. Sony will not *now* deal directly with Best as long as it violates Sony's fair trade program.

13. Sony's price list for direct sales to dealers, the "Pink Price List" is uniformly higher than its price list for sales to distributors, the "White Price List." Sony does not fair trade at the wholesale level and does not suggest at what price distributors should resell. The wholesale price is generally higher for a retailer than the direct-dealing price from Sony.

14. There is no indication that the import price between Sony-Japan and Sony is at an "artificially high" level.

15. Sony does not fair trade all items. See Group IV, Finding 22 herein.

16. Sony did not show any actual monetary damages flowing from the alleged injury to the trademark.

17. Sony did not show Best's profits attributed to Sony products since the commencement of fair trade.

18. Best retails 15,000–20,000 items, merchandising by catalog and selling for cash at showrooms located throughout the southeastern United States. Its policy is to sell at the lowest possible price. Deposition of Sydney Lewis, President of Best, p. 4. Best has achieved sub-

stantial growth, net sales reaching $51,000,000 in the fiscal year ending June 26, 1971 (DX 254).

19. The fair trade prices (PX 9, 10, 25) are in excess of Best's prices charged before November 14, 1971, or on May 25, 1970 (or the nearest preceding date), even allowing for imperfections in Best's data (DX 238–51, 263–265).

20. Best has furnished invoices (DX 1–200), orders to buy (DX 238–251), and a pre-freeze EDP (price) sheet with item updates (DX 263–265), giving data on costs, selling prices and volume. Best has also procured the table of standard freight tariffs relevant to the locations of Best distributors. (DX 376–380). From this, together with the volume and weight of particular Sony items, an approximation of freight costs on particular shipments was computed.

21. The data in findings of fact No. 20 is integrated in DX 201–236. By then taking the difference between selling price and total cost, and dividing by selling price, Best has determined its markup on that shipment. By selecting the highest selling price and lowest cost of shipments before November 14, 1971, Best purports to show its item-by-item "customary initial period markup" on products sold before November 14, 1971, or during the fiscal year before August 15, 1971. On products not sold until after November 14, 1971, Best has in some cases priced, it is claimed, in comparison to similar products. In other cases of items not sold until after November 13, 1971, Best purports to price "historically" with the emphasis on a competitive pricing policy taking into consideration past prices.

22. The following items (Group I) described in Sony's fair trade schedule, were sold by Best before November 14, 1971, and are sold currently: KV1201 KV1212, KV1710, TFM C690W, TV112, TV740. The following items (Group II) sold then are no longer sold, apparently replaced by newer models: KV1210, TV110, TV500, TV710, TV720. The following fair trade items (Group III)

were not sold until after November 13, 1971, but were sold before fair trade and are not shown to be similarly priced to a previous product: MR–9300WA, HP–218–SS–210, TV940. The following items (Group IV) were not sold before November 14, 1971, but were purportedly priced comparably to a previous product: the KV1510 priced comparably to the KV1212 (the difference being in screen size and price, as reflected in the testimony and data), the KV1720 to the KV1710, the TV510U to the TV500, and the TV950 to the TV940. The following products (Group V) were not sold until after fair trade and are not shown to be priced comparably to any previous product: CRF5090, HP510A/SS510, HST230A, 8FC85W, 8FC39W, TFM–C720W, TFM–7400W, TFM–8100WA. The following items (Group VI) are not fair traded: BP71564, HST388, BP12563, 8P218, TR1824, TR6400, Sony 563, 6RC15, Sony 8F11W, Sony 7FC34W.

23. The credibility of the cost and price data contained Findings Nos. 20 and 21 is dubious. It appears to have been prepared specially for this litigation, casting doubt as to whether any prior conscious evaluation of "customary initial period markup" had been made. See deposition of Mr. William Mayes, Best's current buyer of electronics products, p. 35–37, deposition of Mr. Brady L. Rackley, Best's director of data processing, p. 68–70. The gathering of invoices, for example, did not draw on a comprehensive cost file; the implication is that this was a recent ad hoc venture. See Mayes deposition, p. 44–47. Sony's ability to check the cost data was impeded by Best's reluctance to supply Sony with its list of suppliers. See PX 427. The selling price information is also subject to criticism. It would be preferable to have actual selling tickets to verify the information in the orders to buy. Deposition of Mr. Brady L. Rackley, p. 48, 78, 85, 86. The collection of data from orders to buy, also recently done, apparently was not systematic, Mayes deposition, p. 44, and did not reflect

account allowances. Geiger deposition, p. 102–104. Turning to freight cost data, Best admitted it had poor records.

24. Best's catalog prices are virtually identical to a number of other catalog merchandisers' prices. (PX 412, 414–417). Conversations with other retailers influenced the setting of Best prices.

25. Additional indication of the ad hoc nature of the data is the discrepancy between current markups and pre-November 14, 1971 markups revealed by completion of the final column on the invoice listing compilations, DX 201–236, often reflecting substantial decreases. Similar discrepancies are present with respect to products allegedly priced similar to other products (TV510U v. TV510, KV1510 v. KV1212).

26. Still another cloud over the pricing process is formed by the fact that on products sold for the first time after fair trade which had no comparable predecessors, Best made no effort to ascertain the current area market price, as permitted.

27. The fraction used to compute markup is itself an indication that the markup computations were an afterthought. It is natural to use the cost as one's denominator since the percentage markup applies to cost. It is unnatural to use selling price since one does not know the selling price until after the cost is multiplied by the markup and the addition made. But Best has reversed the accepted practice.

28. Best's affirmative evidence of pricing policy during the period before November 14, 1971 is virtually nonexistent. It consists of M. Bruce Reiss' testimony and the depositions of William Mayes and Sydney Lewis. Reiss, vice president in charge of merchandising since January, 1972, testified primarily concerning the considerations affecting a change in the "historical" price. His only reference to the base period consisted of an opinion that Sony products had been priced on a product-line basis but were changed to item-by-item after the freeze. Indeed, Sydney Lewis in his dep-

osition adds some support to the "product-line" thesis in his discussion of the pricing of Zenith products. P. 62–64. Finally, Mayes, the buyer of electronics products, whose deposition would be expected to fill in the large gaps left by Reiss, gives a very confused picture and raises more doubts. He refers the inquiry back to Reiss, who is responsible for 15,000–20,000 items and can state little with specificity. See Mayes deposition, generally.

29. Best made a deliberate decision not to comply with fair trade, in substantial part motivated by its interest in retaining its image of selling at the lowest prices. See Sydney Lewis deposition, p. 6–8, 29–38. The data bears this out, showing no attempt to raise prices on "old products" to the level computed as permissible in its own material. Furthermore, with a number of products which Best might have good reason to consider "new", there appears to have been no thought given to raising prices to the level allowed by the regulations in 6 C.F.R. § 300.409. This includes items sold for the first time after fair trade. (Finding of fact No. 26).

30. Best's presentation of pricing, obscure at best, leaves in sum, numerous areas open to speculation:

a. the pricing of products sold before November 14, 1971: item-by-item, product-line, or department?

b. the pricing of products sold initially after November 13, 1971, but purportedly priced similarly to predecessors.

c. the pricing of products sold initially after November 13, which have not been shown priced similarly to predecessors.

d. the current area market prices for products sold initially after November 13, 1971, at the time these products were first offered for sale.

e. the validity of the data that was supplied concerning costs, prices and markups.

31. Best has a base period profit margin of 6.327% (DX 256, as modified because of accounting corrections to op-

erating income, DX 259(2)). See deposition of Joseph Geiger, Best's accountant, p. 65.

32. Best requested an exception from the definition of "base period" in order to raise its legally permissible profit margin. The Price Commission denied this exception on September 18, 1972. (See DX 257–260).

33. Best has not requested a markup limit exception.

34. Best's profits during the first quarter of the current year, estimated at 7.37%, are in excess of the base period profit margin, but are expected to decrease seasonally according to the nature of the business. (DX 256).

35. It cannot be stated with a reasonable degree of probability whether an increase in the prices on Sony products to fair trade levels will increase or decrease the firm's profits. Even on the question of the profitability of the Sony line, a prediction would be imprudent for lack of adequate information. See Geiger deposition, p. 83–92.

36. If the Price Commission had granted the profit margin exception, it probably would not have affected the pricing of Sony products, deposition of Sydney Lewis, p. 80. The request for the exception was made for reasons independent of this litigation. Sydney Lewis deposition, p. 73–80.

CONCLUSIONS OF LAW

1. Sony properly invokes federal diversity jurisdiction and jurisdiction over the defendant. Findings Nos. 1, 6, 7.

2. The Maryland Fair Trade Act is constitutional against nonsigners. Home Utilities Co., Inc. v. Revere Copper and Brass, Inc., 209 Md. 610, 122 A. 2d 109 (1956). Its purpose is to protect the producer's trademark by preventing the "disastrous" effects of price-cutting. Schill v. Remington Putnam Book Co., 179 Md. 83, 17 A.2d 175, 22 A.2d 128 (1941); Venable v. J. Engel & Co., Inc., 193 Md. 544, 69 A.2d 493 (1949).

3. Sony initiated a fair trade program in May, 1972, which meets the legal requirements set forth in Maryland Annotated Code, Article 83 §§ 102–110 (1969). Specifically

a. Sony-Japan, the owner of the Sony trademark, authorized Sony to execute the described fair trade contracts with certain retailers, specifying minimum resale prices for designated products or "commodities." §§ 102, 103, 105. Findings Nos. 2, 3.

b. These commodities were and are in free and open competition with commodities of other manufacturers. Sony has no monopoly, has not fixed prices, and does not possess an overwhelming share of the market in electronics products. Eastman Kodak Co. v. Home Utilities, Inc. 234 F.2d 766 (4th Cir. 1956); Melrose Distillers, Inc. v. United States, 258 F.2d 726 (4th Cir. 1958); see Gillette Co. v. White Cross Discount Centers, 29 Pa.Dist. & Co.2d 759, 1962 Trade Cas. ¶ 70481 (C.P.1962). Finding No. 11.

c. Sony notified Best of the program, binding Best regardless of its status as "nonsigner." § 104, 107. Finding No. 6.

d. Best wilfully violated the fair trade program by continuing to sell Sony products at prices below the designated minimum prices at its stores in Rockville and Baltimore. Findings Nos. 7, 8, 29.

4. Best has not presented facts sufficient to sustain the defense that Sony lacked reasonable diligence in the equitable enforcement of its fair trade program. The enforcement program described in Findings Nos. 9, 4 and 5—including notices, professional shoppings, warning letters and litigation—was reasonably calculated to insure, and has effected substantial compliance with, fair trade. Finding No. 10. See G.E.M., Inc. v. Plough, Inc., 228 Md. 484, 180 A.2d 478 (1962); Gadol v. Dart Drug Corp., 222 Md. 372, 161 A.2d 122 (1960); Dart Drug Corp. of Maryland v. Eli Lilly & Co., 216 Md. 20, 139 A.2d 272 (1958); Venable v. J. Engel & Co., Inc., supra; Hutzler Bros. Co. v. Re-

mington Putnam Book Co., 186 Md. 210, 46 A.2d 101 (1946).

5. Refusal to deal is no defense. Nothing in the Maryland statute suggests a requirement that Sony sell directly to Best. The weight of authority in other jurisdictions is of the same view with respect to similar legislation. Catalina, Inc. v. Alexander's Department Stores, 1966 Trade Cas. ¶ 71,796 (S.D.N.Y.1966); Parker Pen Co. v. Charles Appliances, Inc., 153 F.Supp. 69 (S.D.N.Y.1957); Ampex Corp. v. Goody Audio Center, Inc., 5 Misc.2d 1072, 163 N.Y.S.2d 191 (Sup.Ct.1957), Burroughs-Wellcome and Co., Inc. v. Johnson Wholesale Perfume Co., Inc., 128 Conn. 596, 24 A.2d 841 (1942). Also, the weight of the evidence in this case does not support the proposition that Sony refused to deal with Best. Finding No. 12.

6. As a corollary to refusal to deal and in part an aspect of "unclean hands," Best points to the discrepancy between Sony's prices to distributors and direct prices to dealers, and the ultimately higher price from the distributor to Best. Finding No. 13. This defense is legally insufficient. The "unclean hands" rule bars discrimination between retailers, but does not forbid quantity discounts or the usual discount to the distributor or even to the large retail buyer. Gillette Co. v. Milshap Drug Sales Corp., 15 Misc.2d 141, 178 N.Y.S.2d 187 (Sup.Ct.1958); Rubbermaid, Inc. v. Claber Distributing Co. of Cleveland, Ohio, Inc., 1965 Trade Cas. ¶ 71,393 (Ohio C.P.); Menley & James Laboratories, Ltd. v. Vornado, Inc., 90 N.J.Super. 404, 217 A.2d 889 (1966). The opinion here is governed then by Conclusion of Law No. 5, on refusal to deal.

7. It is no defense that Sony and its parent Sony-Japan have set an "artificially" high import price. The setting of an import price is irrelevant to fair trade, especially where the purchaser and seller belong to the same corporate family. Furthermore, there was no evidence to support this contention. Finding No. 14.

8. Best's defense that compliance with fair trade would force Best to violate the federal regulations established by the Price Commission pursuant to the Economic Stabilization Act of 1970, Pub.L. 91–379, 84 Stat. 799 (1970), as amended, Pub.L. 92–210, 85 Stat. 743 (1971), deserves more thorough consideration. The pertinent Executive Orders embodying the general mandate of the Price Commission and Pay Board are Nos. 11627, 11640, 11660, and 11676. The regulations relevant to price control are primarily at 6 C.F.R. 300 (1972). Best argues that Sony's fair trade schedule would cause its prices to be above the maximum allowed under the federal formula. There is no question of the constitutionality of the federal law. See Amalgamated Meat Cutters & Butcher Workmen of North America, AFL-CIO v. Connally, 337 F. Supp. 737 (D.D.C.1971). Its purpose is to curb inflation and foster orderly growth through the implementation of a fair and equitable system of wage, rent, and price controls. See University of Southern California v. Cost of Living Council and Office of Emergency Preparedness, 472 F.2d 1065 Em.App., (1972).

It is assumed, without decision, that if Best would violate federal law by charging fair trade prices, the fair trade law would fall to that extent under the Supremacy Clause. The inquiry would then proceed along the path drawn by Chief Justice Marshall:

"Since . . . in exercising the power of regulating their own purely internal affairs . . . the states may sometimes enact laws, the validity of which depends on their interfering with, and being contrary to, an Act of Congress, passed in pursuance of the constitution, the court will enter upon the inquiry, whether the laws of New York [here Maryland], as expounded by the highest tribunal of that state, have, in their application to

this case, come into collision with an Act of Congress, and deprived a citizen of a right to which that act entitles him."

Gibbons v. Ogden, 9 Wheat. 1, 207, 6 L. Ed. 23 (1824); See also Perez v. Campbell, 402 U.S. 637, 91 S.Ct. 1704, 29 L. Ed.2d 233 (1971); Florida Lime & Avocado Growers, Inc. v. Paul, 373 U.S. 132, 83 S.Ct. 1210, 10 L.Ed.2d 248 (1963).

Sony contends that the conflict is of necessity more imagined than real because the Internal Revenue Service, charged with enforcement of the regulations, is empowered to grant exceptions in cases of gross inequity. 6 C.F.R. § 401.303 (1972). See Finding No. 33. But the same chapter in the regulations —Chapter IV, Internal Revenue Service —provides for Price Commission Rulings. 6 C.F.R. § 401.2 (1972). These are opinions of the Chief Counsel of the Internal Revenue Service, with the concurrence of the general counsel of the Price Commission and the Treasury Department, promulgated in the name of the Price Commission and published in the Federal Register. The Service has taken the position that fair trade laws are displaced to the extent inconsistent with the federal law. PC-Ruling 18, 37 Fed.Reg. 766 (1972) PC-Ruling 101, 37 Fed.Reg. 5066 (1972).

Sony also contends that consideration of Best's particular position is premature without a factual determination by the Price Commission. The argument is that, as in a declaratory judgment, Best is requesting a predictive determination. Such a declaratory judgment would be premature, the argument runs, under § 207(b) of the Economic Stabilization Act, on the authority of City of New York v. New York Telephone Co., 468 F.2d 1401 (Em.App. 1972). This situation and that of the usual plaintiff seeking relief without exhausting administrative remedies are distinguishable since the defendant is faced here with a judgment, a possible injunction and damages. The conclusion against Best would not entail a maintenance of the status quo, as in an action by Best for declaratory judgment. This Court has jurisdiction of all defenses in reliance on the Economic Stabilization Act under § 211(a) of that Act. To this need be added only the reasoning of Judge Magruder in Smith v. United States, 199 F.2d 377 at 382 (1st Cir. 1952) to support the determination that the defense is not premature.

In order to evaluate the defense on the merits, it is necessary to analyze the two major limitations on price which govern Best and are at issue—first, the markup limitation, and secondly, the profit margin limitation.[1]

1. The foundation of the law is the "base price," the maximum permissible price for a product during the price freeze of August 16, 1971–November 13, 1971, or on May 25, 1970 (or the nearest preceding date on which the item was sold), whichever is higher. 6 C.F.R. §§ 300.402–403 (1972). The "base price" is computed differently for "new" products—products not offered for sale by the person within the preceding year which are substantially different in purpose, function, quality, or technology, not merely changed in style, packaging, form, fashion, appearance, arrangement or combination. 6 C.F.R. § 300.409(b) (1972). Here, the "base price," at the election of the seller, is (1) the "customary initial percentage markup" (CIPM), to be defined, in the freeze base period (July 16–August 14, 1971, or the nearest preceding 30-day period) on property most nearly similar or (2) the average price received in a substantial number of current transactions by persons selling "comparable" property in the same marketing area. 6 C.F.R. § 300.409(c) (1972).

A retailer such as Best may charge in excess of the "base price" on a product only if:

(1) Its CIPM after November 13, 1971 is equal to or less than its last markup (CIPM) before November 14, 1971, or, at its option, its top markup (CIPM) in the range of its markups during its last fiscal year ending before August 15, 1971. 6 C.F.R. § 300.13(a) (1) (1972), PC–Rulings 1972–151, 1972–152, 37 Fed.Reg. 8562 (1972); Economic Stabilization Q & A's No. 20, (1972). Economic Controls Rep. ¶ 801.40,

The present litigation provides the special feature that *Best must show affirmatively* that the fair trade prices would result in markups excessive under the law described in footnote 1. It is essential then to determine whether "base prices" would be exceeded by fair trade prices, making the appropriate distinction of "new" from "old" products. If so, it is necessary to pinpoint the pricing process, ascertain the top CIPM or current area market price, whichever is relevant, and evaluate the pertinent cost and price data.

For products sold before November 14, 1971, Group I, Finding 22, it is reasonable, despite imperfections in the data, to infer that the fair trade prices are substantially higher than the "base prices." This leads into the markup analysis. That the Price Commission favors the item-by-item system as a matter of administrative control is no excuse for a sophisticated retailer like Best, see Finding No. 18, to cloud the issue by presenting virtually no evidence on the Best pricing process in 1971. Finding Nos. 20–30.

Other than the deposition of William Mayes, Best's current buyer of electronic products offered by Sony, the relevant testimony is limited to that of M. Bruce Reiss. Reiss, vice president in charge of merchandising since January, 1972, with responsibility for 15,000–20,000 items, testified primarily in generalities, and was especially vague on the period before 1972. His brief description of the pre-controls period, moreover, emphasized product-line pricing and was supplemented by the statement of the current pricing system in terms of item adjustments to prices set in the past.

Admittedly, an item-by-item pricing system could include one conducted in such a *manner* as to *result* in independent item percentage markups. Thus, it might be possible to infer a rough kind of item pricing since the assumption by Reiss of his present duties. But, more important, there is absolutely no indication of a dynamic item-by-item process in the prior period or of any effort to gear to such a process after the commencement of fair trade.

Secondly, the static data supplied in the computer printouts, even if taken at full face value, does not show how Best priced. It indicates strongly that Best did not apply the same markup to every item in the Sony line, but does not indicate whether or not some weighted category might have been used, whether on product-line, as Best's President Sydney Lewis' deposition suggests, or even on a department-wide basis. The result is that, even accepting the data, it cannot be stated confidently what markup present markups are to be compared with or show what adjustments between markups of individual products might be made, i. e. the degree to which the raising of current markups on fair-traded products could be compensated for by the lowering of markups on non-fair-traded products, see Findings Nos. 15, 22 (Group VI) and the degree to which markups on fair-traded products could be mutually adjusted to raise at least some to fair trade levels. It is not for the Court to speculate on a matter which is the subject of Best's affirmative defense.

Thirdly, the conversations among catalog merchandisers, with the coincident

801.42. CIPM in turn is the markup (percentage), applied to cost (purchase price to the retailer plus allocable freight), determined on the basis of item, product line, department, store or other unit, according to the *customary* pricing practice, 6 C.F.R. § 300.5 (1972), and depending on the lowest level of "normal application control." PC Release 46 (January 18, 1972) Economic Controls

Rep. ¶ 801.15. In other words, a retailer before the Price Commission has the burden of showing that he prices on other than an "item-by-item" system. This is distinguished from the "aggregate" system where the markup is computed according to the weighted average of sales of products in a category, or where a single markup is applied simultaneously to a particular class of items.

identical prices, Finding No. 24, are of no benefit to Best in such speculation.

Fourthly, it is not to Best's advantage to observe that if there were an item-by-item markup system before November 14, 1971, it would not show from current pricing. There has been no attempt to price fair trade items at or about any appropriate markup limit. Findings Nos. 25–26.

Fifthly, the markup computation based on selling price further diminishes credibility. Finding No. 27.

And finally, there is the dubious validity of the data. Finding No. 23.

Thus, even for the goods in Group I, Finding No. 22, the goods on which a *literal* item-by-item application of the data would show fair trade markups in violation of federal law, the defense fails where one would expect it most likely to succeed.

For items sold initially before fair trade, but after November 13, 1971, and not shown to be priced similarly to predecessors—Group III, Finding No. 22—the criticisms continue on the pricing process and the data. On these, moreover, the issue is further enshrouded because these may be "new" products, subject to special "base price" treatment. 6 C.F.R. § 300.409(c) (1972). The next group of items—Group IV, Finding No. 22—includes those sold initially after November 13, 1971, and purportedly priced similarly to other products, these not being "new" products. This description fits the KV1720, TV510U, and TV950, all refinements respectively of the KV1710, TV500 and TV940. To these the criticisms indicated earlier again apply. For the fourth product in this group, the KV1510, how-

ever, the "substantial difference test" is met. 6 C.F.R. § 300.409(b) (1972). It is significantly different in screen size (15″ v. 12″), market, and price from the KV1212. Since the KV1510 was first sold for sale after fair trade, it is moved into the group of items discussed in the next paragraph.

This last group, including in addition to the KV1510, Group V in Finding No. 22, was sold for the first time after fair trade. There was no evidence that these products were refinements or successors to others previously sold. All are most probably "new," in which case Best had the option under 6 C.F.R. § 300.-409(c)(2) (1972) of using as its "base price" the average price charged in a substantial number of transactions in the market area. This presumably was the fair trade price, since there has been substantial compliance by other retailers. Thus, on this group of items, Best has not a scintilla of argument for noncompliance. Nor would it have any excuse for noncompliance on products added to the line in the future which are arguably "new." Best's conduct regarding these products is further evidence of its complete indifference to an effort to comply with fair trade consistent with the regulations.

For Best to charge in excess of its "base price," it must *also* comply with the profit margin limitation of 6 C.F.R. § 300.13(a) (1972).[2] Best supports its contention that a rise in prices to fair trade levels would cause a margin violation by referring to the denial of its request for an exception and the closeness with which its current financial data tracks its base period profit margin. Findings Nos. 31, 32, 34. But this misses the point. First, it is a matter of con-

---

**2.** In other words, an increase over the "base price" is justifiable only if the aggregate effect of all of its price changes is not to increase its profit margin over that which prevailed during the base period. 6 C.F.R. § 300.13(a)2. The base period includes two of the person's last three fiscal years ending before August 15, 1971, at the person's option. A weighted average of the two most successful years' profits is prerequisite to calculation. 6 C.F.R. § 300.5 (1972). The profit margin itself is defined as the ratio that operating income (net sales less cost of sales and less normal and generally recurring cost of business operations, determined before non-operating items, extraordinary items, and income taxes) bears to net sales. *Ibid.*

jecture whether the increases in Sony prices would increase profits. Finding No. 35. As a discount operation, Best's profitability is linked to *low* prices. Findings Nos. 18, 30. It is plausible to infer that Best was equally concerned about *lower* profits as a result of fair trade. See Finding No. 36. Secondly, the profit margin is defined in the *aggregate*. See also PC-Ruling 72–206, 37 Fed.Reg. 13192 (1972), Economic Controls Rep. ¶ 1021.40. Thus, Best is free to lower or raise prices of other products to adjust. While it is conceivable that a firm dealing exclusively in fair traded products would be unduly burdened, there has been no suggestion that such is the case with Best, which retails some 15,000–20,000 items. Nor has there been any suggestion that the fair trading of other items has caused unusually large profits. Thus, for each of these reasons, Best can not prevail on the facts of this defense.

9. Best having failed to prevail in its affirmative defenses or show any impending collision with federal law, Sony's establishment of the wilful violation of the fair trade law necessitates judgment in its favor.

10. The traditional remedy is injunctive. *G.E.M., Inc. supra; Gadol, supra; Dart Drug Corp., supra; Venable, supra; Hutzler Bros Co., supra.* Best must comply, therefore, with Sony's fair trade program as set forth in the Court's order dated December 18, 1972.

11. Sony has proved no actual damages, Finding No. 16, and it will be denied damages, specifically in the form of its request for an accounting of Best's profits. In addition to the fact that Sony has nowhere shown the amount of these profits, Finding No. 17, such a standard of damages would be punitive rather than compensatory, out of proportion to a realistic assessment of Best's gains. While punitive damages in fair trade actions are not without precedent, Sterling Drug, Inc. v. Benatar, 99 Cal.App.2d 393, 221 P.2d 965 (1950), the Maryland statute, § 107, gives no direction to depart from the usual damage rule. The actual damages here were most likely to Best's competitors, not to Sony. Despite the granting of an accounting in a similar situation in Gillette Co. v. Two Guys from Harrison, 36 N.J. 342, 177 A.2d 555 (1962), the better view, followed here, was proposed in Sunbeam Corp. v. Civil Service Employees Co-op. Ass'n., 187 F.2d 768 (3rd Cir. 1951), rev'd on other grounds, 192 F.2d 572 (3rd Cir. 1951).

For the reasons stated herein, Sony is entitled to the injunctive relief sought in its complaint, as ordered by this Court under date of December 18, 1972.